**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| KEVIN FONG, Derivatively and on Behalf of IOVANCE BIOTHERAPEUTICS, INC., f/k/a LION BIOTECHNOLOGIES, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MANISH SINGH, MICHAEL HANDELMAN, ELMA HAWKINS, KAMILLA BJORLIN, IAIN DUKES, MARIA FARDIS, SANFORD J. HILLSBERG, RYAN MAYNARD, MERRILL A. MCPEAK, WAYNE P. ROTHBAUM, JAY VENKATESAN, and MOLLY HENDERSON,<br><br>Defendants,<br><br>and<br><br>IOVANCE BIOTHERAPEUTICS, INC., f/k/a LION BIOTECHNOLOGIES, INC.<br><br>Nominal Defendant. | C.A. No. _____<br><br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiff Kevin Fong ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of

Nominal Defendant Iovance Biotherapeutics, Inc., f/k/a Lion Biotechnologies, Inc. ("Iovance" or

the "Company"), files this Shareholder Derivative Complaint against Defendants Manish Singh,

Michael Handelman, Elma Hawkins, Iain Dukes, Maria Fardis, Sanford J. Hillsberg, Ryan

Maynard, Merrill A. McPeak, Wayne P. Rothbaum, Jay Venkatesan, and Molly Henderson

(collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or

officers of Iovance, unjust enrichment, waste of corporate assets, abuse of control, gross

mismanagement, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the

"Exchange Act") and SEC Rule 14a-9 promulgated thereunder, and against Defendant Kamilla

Bjorlin for aiding and abetting the foregoing misconduct.   As for his complaint against the Individual Defendants and Defendant Kamilla Bjorlin, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Iovance, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Iovance's current and/or former directors and officers beginning on September 27, 2013 and through the present (the "Relevant Period").

2.     Iovance is a clinical-stage biotechnology company that focuses on the development and commercialization of novel cancer immunotherapies based on tumor infiltrating lymphocytes.

3.     Prior to June 27, 2017, the Company went by the name of Lion Biotechnologies, Inc.[1]

4.     Since the beginning of the Relevant Period to April 2014, Iovance, through its former CEO Manish Singh, retained Lidingo Holdings, LLC ("Lidingo"), a company that provided promotional services to issuers, to publish articles and disseminate hundreds of thousands of emails discussing the Company, all while failing to disclose that these articles and emails were in

---

[1] References to Lion Biotechnologies, Inc., "Lion Bio," "LBIO," or "Lion" throughout this Complaint, including in cited excerpts, refer to Iovance.

fact paid for by Iovance.  As part of the scheme, the Company wasted corporate assets to pay Lidingo to publish over 10 articles on investment websites SeekingAlpha.com ("*Seeking Alpha*") and WallStCheatSheat.com ("*WallStCheatSheet*") and hire a vendor to coordinate the distribution of 390,000 emails describing the Company's stock to potential investors.  The purpose of the stock promotion scheme was to ultimately raise, artificially, the price of Iovance stock and interest in the Company.

5.     From September 2013 to April 10, 2017, the Individual Defendants failed to disclose and admit to the investing public that the stock promotion scheme in fact occurred,[2] the extent of it, and the Company's involvement in it.

6.     On April 10, 2017, the SEC issued an "Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of The Securities Act of 1933 and Section 21C of The Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order" against the Company (the "Order"), which found that through Defendant Manish Singh, the Company in fact misled investors by commissioning the publication of articles and dissemination of emails purported to be independent from Iovance that promoted the Company to potential investors when they were in fact paid promotions.  It also revealed in detail the Company's engagement in the stock promotion scheme and sanctions imposed against the Company as a result, including a $100,000 civil money penalty.

7.     Additionally, according to the Order (and as described further herein), the Company engaged in "improper 'gun-jumping,'" which is the illegal practice of soliciting orders to buy a new issue before registration of the Company's initial public offering has been approved by the SEC.

---

[2] The Company's contract with Lidingo for services was terminated in April 2014.

8.     On April 10, 2017, the price per share of Company stock at the close of trading was $6.35.  On April 11, 2017, the day after the Order was issued, the price per share of Company stock at closing fell to $6.20.

9.     On April 11, 2017, the Company filed a current report on a Form 8-K with the SEC that briefly discussed the Company's settlement with the SEC as referenced in the Order (as detailed further herein).

10.    On this news, the price per share of Company stock fell further to close at $6.15 on April 12, 2017.

11.    From September 27, 2013 to April 2014, in breach of their fiduciary duties owed to Iovance, certain of the Individual Defendants engaged in and/or caused the Company to engage in a scheme consisting of: (1) manipulating the price and trading volume of Iovance's stock, through Defendant Singh, and misleading investors by commissioning over 10 internet publications and 20 widely distributed emails that promoted the Company to potential investors and purported to be independent from the Company when they were actually paid promotions; (2) unlawful "gun jumping;" (3) engaging, through Defendant Singh, the notorious stock promotion firm Lidingo to pay writers to publish articles about the Company on investment websites and to coordinate the distribution of articles to thousands of electronic mailboxes; and (4) Defendant Singh actively participating in the promotional work done by Lidingo for the Company with the understanding that the writers Lidingo used would not disclose that the Company was indirectly compensating them for their publications (collectively, the "Stock Promotion Scheme").[3]

12.    The Stock Promotion Scheme caused various promotional materials to be

---

[3] Defendants Elma Hawkins, Maria Fardis, Wayne P. Rothbaum, Iain Dukes, Ryan Maynard, and Molly Henderson were not with the Company during this period.  Defendant Kamilla Bjorlin, although not with the Company at any point, aided and abetted engagement in the Stock Promotion Scheme.

disseminated that contained false and/or misleading statements or omissions of material fact, were written at the behest of the Company for the purpose of promoting the Company and driving up its stock price, and did not disclose information required to be disclosed under federal law.  The Company also failed to disclose in its SEC filings that it indirectly paid for these promotions, also in violation of federal law.

13.     The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls.

14.     In further breach of their fiduciary duties owed to Iovance and its shareholders, the Individual Defendants made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects, and legal compliance.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

15.     The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties.

16.     The Individual Defendants' breaches of fiduciary duty and other misconduct, and Defendant Bjorlin's aiding and abetting thereof, have subjected the Company, its former Chief Executive Officer ("CEO"), and its former Chief Financial Officer ("CFO") to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal

investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

17.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct, and Defendant Bjorlin's aiding and abetting thereof.

18.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested and/or independent directors, a majority of the Company's board of directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act and the Securities Act of 1933.

20.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

23.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

24.     Plaintiff is a current shareholder of Iovance common stock. Plaintiff has continuously held Iovance common stock at all relevant times.

### Nominal Defendant Iovance

25.     Nominal Defendant Iovance is a Delaware corporation with its principal executive offices at 999 Skyway Road, Suite 150, San Carlos, California 94070.

26.     Iovance stock trades on the NASDAQ Global Market under the ticker symbol "IOVA."

### Defendant Singh

27.     Defendant Manish Singh ("Singh") served as the Company's CEO and Chairman of the Board from July 2013 to December 2014.  According to the Company's Schedule 14A filed with the SEC on September 23, 2014 (the "2014 Proxy Statement"), as of September 8, 2014, Defendant Singh beneficially owned 2,671,000 shares of the Company's common stock, which was about 9.8% of the Company's issued and outstanding common stock.  Given that the price per

share of the Company's common stock at the close of trading on September 8, 2014 was $7.45, Singh owned over $19.8 million worth of Iovance stock.

28.     For the fiscal year ended December 31, 2014, Defendant Singh received $534,000 as compensation from the Company, which included $350,000 as base salary and a $184,000 bonus.

29.     The Company's 2014 Proxy Statement stated the following about Defendant Singh:

<u>Manish Singh</u>.[4]  Dr. Singh has served as our Chief Executive Officer and Chairman of the Board since his appointment on July 24, 2013.  Dr. Singh also served as our President from July 2013 until August 2014.  Dr. Singh is a founder and principal of Lion Biotechnologies, Inc., the Delaware Company that we acquired in July 2013.  Prior to founding Lion Delaware, Dr. Singh served as the President, Chief Executive Officer and as a Director of ImmunoCellular Therapeutics, Ltd from February 2008 to August 2012.  Dr. Singh served as a Director at California Technology Ventures, a venture capital firm from June 2003 to December 2007. He managed investments made by that venture capital firm in a number of medical device and biotechnology companies and served as a board director or board observer for several of the firm's portfolio companies. From October 1995 to June 2003, he held various management and scientific positions with Odysseus Solutions, Cell Genesys, Chiron Corporation and Genetic Therapy, Inc. Dr. Singh has an MBA from UCLA, a Ph.D. in Chemical and Biochemical Engineering from the University of Maryland Baltimore County, an M.S. in Chemical Engineering from Worcester Polytechnic Institute and a B.S. in Chemical Engineering from the Indian Institute of Technology, Roorkee.

**<u>Defendant Handelman</u>**

30.     Defendant Michael Handelman ("Handelman") served as the Company's CFO and Secretary from February 2011 to June 2015.  According to the Company's Schedule 14A filed with the SEC on April 30, 2015 (the "2015 Proxy Statement"), as of April 24, 2015, Defendant Handelman beneficially owned 100,000 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 24, 2015 was $12.34, Handelman owned over $1.2 million worth of Iovance stock.

---

[4] Emphasis in original unless otherwise stated throughout.

31.     For the sixth months of 2015 that he was employed by the Company, Defendant Handelman received $116,077 as compensation from the Company.

32.     The Company's 2015 Proxy Statement stated the following about Defendant Handelman:

> <u>Michael Handelman</u>. Mr. Handelman has served as our Chief Financial Officer and Secretary since February 2011. He also was on our Board of Directors from February 2011 until the Restructuring in May 2013. Mr. Handelman served as the Chief Financial Officer and as a financial management consultant of Oxis International, Inc., a public company engaged in the research, development and commercialization of nutraceutical products, from August 2009 until October 2011. From November 2004 to July 2009, Mr. Handelman served as Chief Financial Officer and Chief Operating Officer of TechnoConcepts, Inc., formerly a public company engaged in designing, developing, manufacturing and marketing wireless communications semiconductors, or microchips. Prior thereto, Mr. Handelman served from October 2002 to October 2004 as Chief Financial Officer of Interglobal Waste Management, Inc., a manufacturing company, and from July 1996 to July 1999 as Vice President and Chief Financial Officer of Janex International, Inc., a children's toy manufacturer. Mr. Handelman was also the Chief Financial Officer from 1993 to 1996 of the Los Angeles Kings, a National Hockey League franchise. Mr. Handelman is a certified public accountant and holds a degree in accounting from the City University of New York.

**<u>Defendant Hawkins</u>**

33.     Defendant Elma Hawkins ("Hawkins") served as the Company's CEO from January 2015 to June 1, 2016.  She served as the Company's President from August 2014 to June 1, 2016.  She additionally served as the Company's Chief Operating Officer from August 2014 to December 2014.  She was a director from December 2014 to June 1, 2016.  According to the Company's Schedule 14A filed with the SEC on April 20, 2017 (the "2017 Proxy Statement"), as of April 5, 2017, Defendant Hawkins beneficially owned 1,007,299 shares of the Company's common stock, which was about 1.6% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2017 was $6.90, Hawkins owned over $6.9 million worth of Iovance stock.

34.   For the fiscal year ended December 31, 2016, Defendant Hawkins received $3,184,633 as compensation from the Company, which included $325,395 in base salary, $2,719,238 in stock options, a $110,000 bonus, and $30,000 in all other compensation.

35.   The Company's 2015 Proxy Statement stated the following about Defendant Hawkins:

> <u>Elma Hawkins, Ph.D.</u> Dr. Hawkins was appointed as a director effective December 12, 2014, and as our Chief Executive Officer effective January 1, 2015. From August 21, 2014 until her appointment as our Chief Executive Officer on December 12, 2014, Dr. Hawkins was our President and Chief Operating Officer. From February 2014 until her appointment as President and Chief Operating Officer, Dr. Hawkins served as this Company's Head of Clinical Development under a consulting agreement. Since 2006 Dr. Hawkins has been an independent consultant to various biotechnology companies and financial institutions.  Dr. Hawkins started her career at Warner-Lambert/Parke-Davis in Clinical Research.  Later she joined the Center for the Study of Drug Development at Tufts Medical School.  Following that, she held various positions at BioSurface Technology and Genzyme Corporation, and at Antigenics, most recently as that company's Vice Chairman.  Later, she was President and CEO of Advanced Viral Research.  She also serves on the Health Care Advisory Board for the Partnership for New York City.  Dr. Hawkins has BSc in Mathematics and Chemistry, BSc (Hons) in Chemistry, MSc in Organic Chemistry, a PhD in Organic Chemistry and an MBA with specialization in entrepreneurship.
>
> Our Board of Directors believes that Dr. Hawkins is highly qualified to serve as a member of the board because of her scientific and business background and education, her experience in research and development, and because of her leadership experience, including as Chief Executive Officer of a biopharmaceutical company.

**Defendant Fardis**

36.   Defendant Maria Fardis ("Fardis") has served as the Company's CEO and President since June 2016.  She has also served as a Company director since June 2016.  According to the Company's 2017 Proxy Statement, as of April 5, 2017, Defendant Fardis beneficially owned 348,327 shares of the Company's common stock.  Given that the price per share of the Company's

common stock at the close of trading on April 5, 2017 was $6.90, Fardis owned over $2.4 million worth of Iovance stock.

37.     For the fiscal year ended December 31, 2016, Defendant Fardis received $6,561,347 as compensation from the Company, which included $291,667 in base salary, $3,228,500 in stock awards, $2,891,180 in stock options, and $150,000 in all other compensation.

38.     The Company's 2017 Proxy Statement stated the following about Defendant Fardis:

> <u>Maria Fardis, Ph.D.</u> Dr. Fardis joined the Company as President and Chief Executive Officer on June 1, 2016 and was appointed to our Board of Directors on June 7, 2016. Dr. Fardis served as the Chief Operating Officer of Acerta Pharma, LLC, a clinical-stage biopharmaceutical company, from January 2015 to March 2016. From 2011 to 2014, she worked at Pharmacyclics, Inc., which she joined as Senior Director of Global Project Management, and was promoted to Vice President, Alliance and Global Project Management in December 2011, was appointed Executive Vice President, Alliances and Operations in September 2012 and was appointed Chief of Oncology Operations and Alliances in March 2013. Prior to joining Pharmacyclics, from August 2001 to April 2011, Dr. Fardis held increasingly senior positions in Medicinal Chemistry and the project and portfolio management department at Gilead Sciences, Inc., most recently serving as Associate Director, Project and Portfolio Management. Dr. Fardis received her Ph.D. in Organic Chemistry from the University of California, Berkeley and her B.S. *summa cum laude*, in chemistry from the University of Illinois, Urbana-Champaign. Dr. Fardis holds an MBA, with highest honors, from Golden Gate University.
>
> Our Board of Directors believes that Dr. Fardis is highly qualified to serve as a member of the Board because of her experience both as an executive of biopharmaceutical companies and as a scientist.

## Defendant Bjorlin

39.     Defendant Kamilla Bjorlin ("Bjorlin") organized and operated Lidingo from at least September 2011 through March 2014, and directed its stock promotion services on behalf of publicly-traded clients.

## Defendant Rothbaum

40.     Defendant Wayne P. Rothbaum ("Rothbaum") has served as a Company director since June 2016.  He also serves as a member of the Compensation Committee.  According to the Company's 2017 Proxy Statement, as of April 5, 2017, Defendant Rothbaum beneficially owned 3,846,280 shares of the Company's common stock, which was about 6.2% of the Company's issued and outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on April 5, 2017 was $6.90, Rothbaum owned over $26.5 million worth of Iovance stock.

41.     The Company's 2017 Proxy Statement stated the following about Defendant Rothbaum:

> <u>Wayne P. Rothbaum</u> . Mr. Rothbaum joined our Board of Directors on June 7, 2016. Mr. Rothbaum is currently the President of Quogue Capital LLC, a life sciences investment fund he founded in 2001. Beginning in 2012, Mr. Rothbaum served as the co-founder and largest investor of Acerta Pharma, B.V., a Dutch biotech focused on developing selective, covalent small molecules to treat cancer and inflammation. Acerta Pharma was sold to AstraZeneca in February 2016. From February 2013 until its sale in February 2016, Mr. Rothbaum served as the executive chairman of Acerta Pharma. From 1993 until 2001, Mr. Rothbaum led the biotechnology practice at the strategic consulting firm The Carson Group. Mr. Rothbaum graduated Phi Beta Kappa from Binghamton University in 1990 with a dual major in political science and psychology and received his Master's degree in international economics from The George Washington University.
>
> Our Board of Directors believes that Mr. Rothbaum is highly qualified to serve as a member of the Board on the basis of his business background and education, his investment experience as the manager of an investment fund focused on the life sciences industry, and his experience serving in a leadership capacity with other biotechnology companies.

42.     Defendant Rothbaum is the President of Quogue Capital LLC, which on June 7, 2016, entered into a purchase agreement and registration rights agreement with the Company to purchase 1,646,280 shares of Iovance common stock and 1,932,667 shares of Iovance's Series B Preferred stock for a purchase price of $17,000,000 (the "Quogue Agreement").  Pursuant to the Quogue Agreement, Defendant Rothbaum was appointed to the Board.

### Defendant Dukes

43.     Defendant Iain Dukes ("Dukes") has served as a Company director since August 2016.  He also serves as the Chairman of the Board and also serves as a member of the Audit Committee and as a member of the Nominating and Governance Committee.  According to the Company's 2017 Proxy Statement, as of April 5, 2017, Defendant Dukes beneficially owned 52,500 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 5, 2017 was $6.90, Dukes owned $362,250 worth of Iovance stock.

44.     For the fiscal year ended December 31, 2016, Defendant Dukes received $655,219 as compensation from the Company, which included $27,921 in fees earned or cash paid and $627,298 in option awards.

45.     The Company's 2017 Proxy Statement stated the following about Defendant Dukes:

> Iain Dukes, D. Phil . Dr. Dukes joined our Board of Directors on August 4, 2016 and was appointed Chairman of the Board on August 16, 2016. Dr. Dukes currently is a Venture Partner at OrbiMed Advisors LLC. He previously served as Senior Vice-President and Head of Business Development and Licensing for Merck Research Laboratories through May 2016. He joined Merck in August 2013. Prior to joining Merck, Dr. Dukes was Vice-President of External Research & Development at Amgen, from August 2010 to August 2013. From 2007 to 2010, Dr. Dukes was the President and Chief Executive Officer, and a member of the board of directors, of Essentialis Therapeutics, a clinical stage biotechnology company focused on the development of breakthrough medicines for the treatment of rare metabolic diseases. From 2000 to 2007, Dr. Dukes was Vice President of Scientific and Technology Licensing at GlaxoSmithKline, and prior to that, from 1990 to 1999, he held various positions at Glaxo Wellcome, including Head of Exploratory Development for Metabolic and Urogenital Diseases and Head of Ion Channel Drug Discovery Group. Dr. Dukes holds Master of Jurisprudence and Doctorate of Philosophy degrees from the University of Oxford, a Master of Science degree in Cardiovascular Studies from the University of Leeds and a Bachelor of Science degree in Pharmacology from the University of Bath.

Our Board of Directors believes that Dr. Dukes is highly qualified to serve as a member of the Board because of his extensive experience in the pharmaceutical industry, including in senior management roles.

**Defendant Hillsberg**

46.     Defendant Sanford J. Hillsberg ("Hillsberg") has served as a Company director since September 2013.  According to the Company's 2017 Proxy Statement, as of April 5, 2017, Defendant Hillsberg beneficially owned 251,250 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 5, 2017 was $6.90, Hillsberg owned over $1.7 million worth of Iovance stock.

47.     For the fiscal year ended December 31, 2016, Defendant Hillsberg received $362,770 as compensation from the Company, which included $49,124 in fees earned or cash paid and $313,646 in option awards.

48.     The Company's 2017 Proxy Statement stated the following about Defendant Hillsberg:

> Sanford J. Hillsberg . Mr. Hillsberg joined our Board of Directors on September 3, 2013. Mr. Hillsberg has been an attorney with TroyGould PC since 1976 and is a member of that firm's Management Committee. Mr. Hillsberg has served as the Chairman of the Board of Directors of Galena Biopharma, Inc., a publicly-held biopharmaceutical company focused on developing oncology treatments, since 2007. He also has served since January 12, 2017 as Chairman of the Board of Directors of Nacuity Pharmaceuticals, Inc., a privately held development stage company developing a therapeutic treatment for retinal disease. Mr. Hillsberg was a founder and until December 2007, served as a director and Secretary of ImmunoCellular Therapeutics, Ltd., a publicly-held clinical-stage biotechnology company focused on developing immune-based therapies to treat cancer, and its predecessor company since February 2004. Mr. Hillsberg served as a director and Secretary of Duska Therapeutics, Inc., a publicly-held biopharmaceutical company, and its predecessor company from 1999 until January 2006. He previously served as a director and Vice President of Medco Research, Inc., a then publicly-held pharmaceutical company. Mr. Hillsberg is a member of the Board of Governors of Cedars-Sinai Medical Center and has also previously served as a Commissioner of the Quality and Productivity Commission of the City of Los Angeles. Mr. Hillsberg holds a B.A. degree from the University of Pennsylvania and a J.D. degree from Harvard Law School.

Our Board of Directors believes that Mr. Hillsberg is highly qualified to serve as a member of the Board because of Mr. Hillsberg's extensive prior experience in founding and serving on the Boards of a number of pharmaceutical and biotech companies as well as his expertise in legal and other related matters pertaining to the operation of publicly traded pharmaceutical companies.

49.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Hillsberg made the following sales of Company stock (and made no purchases of Company stock). On March 6, 2015, Defendant Hillsberg sold 50,000 shares of Company stock for $10.00 per share.  On August 3, 2015, Defendant Hillsberg sold 32,500 shares of Company stock for $8.15 per share.   On September 4, 2015, Defendant Hillsberg sold 16,000 shares of Company stock for $6.84.   On September 8, 2015, Defendant Hillsberg sold 16,500 shares of Company stock for $7.13 per share. On August 22, 2016, Defendant Hillsberg sold 54,000 shares of Company stock for $9.10 per share.  On August 24, 2016, Defendant Hillsberg sold 33,500 shares of Company stock for $9.09 per share.  On August 25, 2016, Defendant Hillsberg sold 20,500 shares of Company stock for $8.71 per share.  Thus, before the fraud was exposed, he sold 223,000 Company shares on inside information, for which he received $1,967,063.   His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the fraud.

50.     Defendant Hillsberg is an attorney at TroyGould PC, a law firm that has rendered and continues to render legal services to the Company.

**Defendant Maynard**

51.     Defendant Ryan Maynard ("Maynard") has served as a Company director since February 2015.  He also serves as the Chairman of the Audit Committee.  According to the Company's 2017 Proxy Statement, as of April 5, 2017, Defendant Maynard beneficially owned

111,250 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2017 was $6.90, Maynard owned $767,625 worth of Iovance stock.

52.    For the fiscal year ended December 31, 2016, Defendant Maynard received $367,396 as compensation from the Company, which included $53,750 in fees earned or cash paid and $313,646 in option awards.

53.    The Company's 2017 Proxy Statement stated the following about Defendant Maynard:

> Ryan Maynard . Mr. Maynard joined our Board of Directors on February 16, 2015. Mr. Maynard currently is the Executive Vice President and Chief Financial Officer of Rigel Pharmaceuticals, Inc., a clinical-stage drug development public company. He joined Rigel in September 2001 as Corporate Controller and was appointed as an Assistant Secretary in October 2001. In June 2006 he became Rigel's Vice President of Finance and Acting Chief Financial Officer and became its Vice President and Chief Financial Officer in January 2007. Prior to joining Rigel, Mr. Maynard was Corporate Controller and Director of Finance and Accounting for Personify, Inc., an e-commerce software company, from November 1999 to April 2001. From July 1998 to October 1999 he served as Controller of General Magic, Inc. and from July 1994 to June 1998 he held various positions at Siliconix, Inc., most recently as Senior Finance Manager. He previously worked at Ernst & Young LLP. Mr. Maynard holds a B.S. in Commerce—Accounting from Santa Clara University.
>
> Our Board of Directors believes that Mr. Maynard is highly qualified to serve as a member of the Board because of his extensive experience as the Chief Financial Officer of a publicly traded pharmaceutical companies, as well as his expertise in auditing and financial and other related matters pertaining to the operation of publicly traded pharmaceutical companies.

**Defendant McPeak**

54.    Defendant Merrill A. McPeak ("McPeak") has served as a Company director since July 2011. He also serves as the Chairman of the Nominating and Governance Committee and as a member of the Audit Committee and as a member of the Compensation Committee. According to the Company's 2017 Proxy Statement, as of April 5, 2017, Defendant McPeak beneficially

owned 602,833 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 5, 2017 was $6.90, McPeak owned over $4.1 million worth of Iovance stock.

55.   For the fiscal year ended December 31, 2016, Defendant McPeak received $375,216 as compensation from the Company, which included $61,569 in fees earned or cash paid and $313,646 in option awards.

56.   The Company's 2017 Proxy Statement stated the following about Defendant McPeak:

> Merrill A. McPeak. General (Ret.) McPeak joined our Board of Directors in July 2011. From February 2015 until the appointment of Dr. Dukes as our new Chairman, General McPeak was the lead director on our Board of Directors. General McPeak also served as our unpaid, interim Chief Executive Officer from January 14, 2013 until July 24, 2013. General McPeak currently is the President of McPeak and Associates, a consulting firm that he founded in 1995. He has previously served as a director of several public companies, including Tektronix, Inc., Trans World Airlines, Inc., and ECC International Corp., where he was for many years the chairman of the Board. General McPeak has served as a director of Research Solutions, Inc., a company engaged in developing systems to reuse published content, since November 2010, of Aerojet Rocketdyne , an aerospace and defense contractor, since March 2013, and of Lilis Energy, an independent oil and gas producer, since January 2015. He was Chairman of the Board of Coast Plating, Inc., a privately held turnkey provider of metal processing and metal finishing services, from January 2009 until the company was acquired by Trive Capital and renamed Valence Surface Technologies, now the country's largest independently owned aerospace and defense metal processing company. He continues to be a Director of that company. He helped found, and from December 2003 to February 2012 was Chairman of the Board of EthicsPoint, Inc., a provider of risk management and compliance software-as-a-service that was acquired in 2012 and restyled Navex Global. General McPeak remained a member of the Board of Directors of Navex Global until that company was sold in 2014.
>
> From 1990 until his retirement from active military service in late-1994, General McPeak was Chief of Staff of the United States Air Force. As a member of the Joint Chiefs of Staff, General McPeak was a military advisor to the Secretary of Defense and the President of the United States. General McPeak received a Bachelor of Arts degree in economics from San Diego State College and a Master of Science degree in international relations from George Washington University, and is a member of

the Council on Foreign Relations. Since July 2010, General McPeak has been Chairman of the American Battlefield Monuments Commission.

Our Board of Directors believes that General McPeak is highly qualified to serve as a member of the Board because of his extensive leadership experience, including his experience in the military and as a director on numerous public and private company Boards of Directors.

### Defendant Venkatesan

57.     Defendant Jay Venkatesan ("Venkatesan") has served as a Company director since September 2013. He also serves as the Chairman of the Compensation Committee and as a member of the Audit Committee and as a member of the Nominating and Governance Committee. According to the Company's 2017 Proxy Statement, as of April 5, 2017, Defendant Venkatesan beneficially owned 2,974,583 shares of the Company's common stock, which was about 4.8% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2017 was $6.90, Venkatesan owned over $20.5 million worth of Iovance stock.

58.     For the fiscal year ended December 31, 2016, Defendant Venkatesan received $374,896 as compensation from the Company, which included $61,250 in fees earned or cash paid and $313,646 in option awards.

59.     The Company's 2017 Proxy Statement stated the following about Defendant Venkatesan:

Jay Venkatesan , M.D. Dr. Venkatesan joined our Board of Directors on September 3, 2013. Dr. Venkatesan is currently a Managing Partner of Alpine BioVentures. He also currently serves as President and a Director of Alpine ImmuneSciences, a biotechnology company developing a novel protein immunotherapy platform for the treatment of cancer and autoimmune diseases. Previously, Dr. Venkatesan was Executive Vice President and General Manager of Oncothyreon, Inc. (currently Cascadian Therapeutics, Inc.), a publicly-traded biotechnology focused on the development of therapeutics for the treatment of cancer and rare diseases. He joined Oncothyreon following its acquisition of Alpine BioSciences, where Dr. Venkatesan served as the founder and CEO. Alpine Biosciences, Inc. was a private

nanotherapeutics company focused on rare diseases and oncology.  Previously, Dr. Venkatesan was the Managing Member and Portfolio Manager of Ayer Capital Management LP, a position that he held since founding that dedicated health care investment fund in 2008.  Prior to founding Ayer Capital, he was a Director at Brookside Capital Partners, the hedge fund affiliate of Bain Capital, where he co-managed a portfolio of public and private investments across biopharmaceuticals, medical devices, and healthcare services. Previously, he was involved in healthcare venture investing at Patricof & Co. Ventures and in consulting at McKinsey & Company. Dr. Venkatesan received his M.D. from the University of Pennsylvania School of Medicine and his MBA from the Wharton School of the University of Pennsylvania. He received his B.A., *magna cum laude* , from Williams College, where he was elected to Phi Beta Kappa.

Our Board of Directors believes that Dr. Venkatesan is highly qualified to serve as a member of the Board because of his medical and business background and education, his investment experience as the manager of an investment fund, and his experience as an officer of biotechnology companies.

### Defendant Henderson

60.     Defendant Molly Henderson ("Henderson") served as the Company's CFO and Secretary from June 2015 to November 2016.  According to the Company's 2017 Proxy Statement, as of April 5, 2017, Defendant Henderson beneficially owned 429,751 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 5, 2017 was $6.90, Henderson owned over $2.9 million worth of Iovance stock.

61.     For the fiscal year ended December 31, 2016, Defendant Henderson received $2,399,751 as compensation from the Company, which included $216,933 in base salary, a $93,333 bonus, $1,739,485 in stock options, and $350,000 in all other compensation.

62.     The Company's Schedule 14A filed with the SEC on July 7, 2016 stated the following about Defendant Henderson:

Molly Henderson. Ms. Henderson was appointed as our Chief Financial Officer and Corporate Secretary since June 8, 2015. Ms. Henderson served as the Chief Business and Financial Officer, Senior Vice President of VirtualScopics, Inc., a public company provider of imaging solutions to the pharmaceutical, biotechnology, and medical device industries, from May 2008 to August 2013, and as that company's Chief Financial Officer from May 2003 to May 2008. From 2013

to 2015, Ms. Henderson relocated her family to Europe, during which time Ms. Henderson advised start-up companies in Switzerland. Earlier in her career, Ms. Henderson served as the Corporate Controller of Ultralife, Inc., a publicly-held provider of high performance lithium battery solutions. Prior to Ultralife, Ms. Henderson was a Manager in the audit division of PricewaterhouseCoopers LLP. Ms. Henderson received her M.B.A. and B.S. degrees from the State University of New York at Buffalo.

## RELEVANT NON-PARTIES

**Lavos**

63.     Lavos LLC ("Lavos") is a stock promotion firm formed in Nevada and controlled by Defendant Singh from 2011 to 2014, providing promotional services to publicly-traded company clients.

**Lidingo**

64.     Lidingo was a limited-liability company formed in Nevada in 2011 and dissolved in 2014, and provided promotional services to publicly-traded company clients.  Lidingo was owned and operated by Defendant Bjorlin, who was the only member or managing member.

**Nichols**

65.     Brian Nichols ("Nichols") worked for Lidingo as a paid writer from February 2012 through at least March 2014, and wrote at least several articles regarding the Company for which he was paid that were published by Lidingo under its various pseudonyms.

**Meyer**

66.     Thomas Meyer ("Meyer") worked for Lidingo as a paid writer and published at least two articles concerning the Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

67.     By reason of their positions as officers, directors and/or fiduciaries of Iovance and because of their ability to control the business and corporate affairs of Iovance, the Individual Defendants owed Iovance and its shareholders fiduciary obligations of trust, loyalty, good faith,

and due care, and were and are required to use their utmost ability to control and manage Iovance in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Iovance and its shareholders so as to benefit all shareholders equally.

68.     Each director and officer of the Company owes to Iovance and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

69.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Iovance, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

70.     To discharge their duties, the officers and directors of Iovance were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

71.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Iovance, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Iovance's

Board at all relevant times.

72.     To discharge their duties, the officers and directors of Iovance were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Iovance were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to Iovance's own Code of Conduct and Ethics and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Iovance conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Iovance and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Iovance's operations would comply with all laws and Iovance's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

73.    Each of the Individual Defendants further owed to Iovance and the shareholders the duty of loyalty requiring that each favor Iovance's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

74.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Iovance and were at all times acting within the course and scope of such agency.

75.    Because of their advisory, executive, managerial, and directorial positions with Iovance, each of the Individual Defendants had access to adverse, non-public information about the Company.

76.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein,

as well as the contents of the various public statements issued by Iovance.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

77.     In committing the wrongful acts alleged herein, the Individual Defendants and Defendant Bjorlin have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants and Defendant Bjorlin caused the Company to conceal the true facts as alleged herein. The Individual Defendants and Defendant Bjorlin further aided and abetted and/or assisted each other in breaching their respective duties.

78.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Exchange Act, and Defendant Bjorlin's aiding and abetting thereof; (ii) to conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; (iii) to engage in the Stock Promotion Scheme; and (iv) to artificially inflate the Company's stock price while one of the Individual Defendants engaged in lucrative insider sales.

79.     The Individual Defendants and Defendant Bjorlin accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to engage in a corrupt and undisclosed stock promotion scheme, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Iovance was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

80.     Each of the Individual Defendants and Defendant Bjorlin aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants and Defendant Bjorlin acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

81.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Iovance, and was at all times acting within the course and scope of such agency.

## CODE OF CONDUCT AND ETHICS

82.     The Company's Code of Conduct and Ethics (the "Code of Ethics") found on the Company's website, www.iovance.com, states that "[a]ll of our directors, officers and employees must conduct themselves according[…] [to the Code of Ethics] and seek to avoid even the appearance of improper behavior."

83.     The Code of Ethics provides, as to "Honesty and Integrity," that:

Our business is based on mutual trust, honesty and integrity in all of our affairs, both internally and externally. This philosophy must be respected at all times. Each of us must be truthful in our business dealings with each other, and with our auditors, legal counsel, regulators and loan review and compliance staffs. Illegal, dishonest and fraudulent acts are grounds for termination. Making false statements or otherwise misleading internal or external auditors, attorneys, regulators or loan review and compliance personnel is prohibited. You must never withhold or fail to communicate fully information that is requested in connection with an appropriately authorized investigation or review. Any concealment of information is a violation of your employment agreement, which may result in termination of your employment with the Company and could constitute a criminal act.

84.     The Code of Ethics provides, as to "Protecting Corporate Assets," that:

You are responsible for safeguarding the assets of the Company. Company assets must not be used for personal benefit. The Company's assets include, but are not limited to, all of its properties, including intellectual properties, business information, cash, and securities. Misappropriation of Company assets is a

violation of your employment agreement, which may result in termination of your employment with the Company and could constitute a criminal act.

85.    The Code of Ethics provides, as to "Accuracy of Company Records and Reports,"

that:

The Company is committed to maintaining records, data and information that are accurate and complete so as to permit the Company to make timely and accurate disclosures to its regulators and to its stockholders. You are personally responsible for the integrity of the information, reports and records under your control. Records must be maintained in sufficient detail so as to reflect accurately the Company's transactions and activities. Our financial statements must be prepared in accordance with generally accepted accounting principles ("GAAP") and fairly present, in all material respects, the financial condition and results of the Company. To accomplish full, fair, and accurate reporting, you must ensure that financial reports issued by the Company are timely, accurate, understandable, and complete.

86.    The Code of Ethics provides, as to "Compliance With Laws," that:

The Company's activities shall always be in full compliance with applicable laws and regulations. When such laws or regulations are ambiguous or difficult to interpret, you should seek advice from the Company's outside legal counsel.

87.    The Code of Ethics provides, as to "Conflicts of Interest," that:

You must conduct your private, business, and personal activities in a manner that avoids conflict with, or even the appearance of conflict with, your ability to act solely in the interests of the Company. A conflict of interest arises if you have interests of any nature that compromise your ability to act objectively and in the best interests of the Company. Conflicts can arise directly or through your family members or through business or other entities in which you or your family members have an interest. At no time may you, on behalf of the Company, transact personal business, the business of an immediate family member, or the business of a for profit entity in which you or a member of your immediate family has an interest (other than an interest not exceeding 1% in a publicly traded company (a "Permitted Public Company Interest")), with the Company. In all such situations, you must disqualify yourself from involvement with any transaction or relationship between that person and the Company.

88.    The Code of Ethics provides, as to "Confidential Information," that:

You shall not use the Company's confidential and nonpublic information in any manner for personal advantage or to provide advantage to others.

89.    The Code of Ethics provides, as to "Insider Trading," that:

You must at all times comply with all laws and regulations concerning insider trading. In general, you are prohibited by applicable law from trading in the securities of any company while in possession of material, nonpublic information (also known as "inside information") regarding that company. This prohibition applies to the Company's securities as well as to the securities of other companies, including the Company's customers and suppliers, and to transactions for any account of the Company, client account or personal account. It is also illegal to "tip" or pass on inside information to any other person if you know or reasonably suspect that the person receiving such information from you will misuse such information by trading in securities or passing such information on further, even if you do not receive any monetary benefit.

90.     In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to: (1) maintain honesty and integrity in the Company's affairs; (2) protect corporate assets; (3) make accurate filings with the SEC and other regulatory authorities; (4) comply with applicable laws; (5) not engage in insider trading; (6) avoid conflicts of interest; and (7) not use nonpublic information for their personal advantage.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

91.     Iovance is a clinical-stage biotechnology company that focuses on the development and commercialization of novel cancer immunotherapies based on tumor infiltrating lymphocytes.

92.     Effective June 1, 2017, the Company changed its state of incorporation from the State of Nevada to the State of Delaware by filing articles of conversion with the Nevada Secretary of State and a certificate of conversion and a certificate of incorporation with the Delaware Secretary of State.

93.     As a result of the conversion, each of the issued and outstanding shares of common stock of the Company when it was incorporated in Nevada automatically converted into an issued and outstanding share of common stock of the Company as incorporated in Delaware.

94.     On June 27, 2016, the Company changed its name from Lion Biotechnologies, Inc. to Iovance Biotherapeutics, Inc.

## The Federal Securities Laws on Stock Promotion

95.     The Individual Defendants' failure to disclose the Company's paid relationship with a stock promoter ran afoul of Section 17(b) of the Securities Act of 1933.

96.     Section 17(b) – commonly known as the "anti-touting" provision – provides, in pertinent part, that anyone who advertises a stock, even if he does not purport to offer the security for sale, must disclose the "consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, the receipt, whether past or prospective, of such consideration and the amount thereof."  15 U.S.C. §77q(b).

97.     This anti-touting provision was enacted, in part, to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for."[5]

98.     In an investor bulletin published by the SEC titled "Microcap Stock: A Guide for Investors,"[6] the SEC provides information about investment in microcap stocks and specifically warns of potential fraud, explaining as follows:

> Paid Promoters: Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows . . . . The federal securities laws require the publications to disclose who paid them for the promotion, the amount, and the type of payment.  ***But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice.***

(Emphasis added.)

99.     Moreover, an issuer of securities is also required to disclose the details of its relationship with a stock promoter in its regulatory filings.  Here, Defendants' failure to disclose the stock promoter's receipt of compensation directly or indirectly from the Company for making

---

[5] *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (quoting House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

[6] This SEC investor bulletin may be found at: http://www.sec.gov/investor/pubs/microcapstock.htm.

material statements concerning Iovance is a material omission.

### Relevant Events Preceding the Stock Promotion Scheme

100.    On July 24, 2013, Genesis Biopharma, Inc., the predecessor entity of the Company,

entered into an Agreement and Plan of Merger with the Company.   Under the merger agreement,

Defendant Singh received 8.2% of shares of the Company, but had the right to receive up to 16.4%

based on the achievement of certain milestones.   Also per the merger agreement, during the 12-

month period following the merger, Defendant Singh would receive additional shares of common

stock based in part on his percentage ownership of Company stock for each $1,000,000 of gross

proceeds received by the Company from any financings, licensing, or similar transaction,

excluding those entered into with certain listed investors.

101.    The merger also entitled Singh to earn additional shares of Company stock if the

closing price per share of Company stock equaled or exceeded $0.04, as adjusted for any stock

split, reverse stock split, recapitalization or the like and $100,000 of common stock is traded for

any 10 out of 30 consecutive trading days during the 18 months following the merger.

102.    Per Defendant Singh's employment agreement, his annual base salary was $34,000

until the Company raised at least $1,000,000 in additional financing, at which point his salary

would then automatically be increased to $350,000.

103.    Thus, Defendant Singh had significant incentives to artificially inflate the

Company's stock price and misleadingly create a positive financial image of the Company to draw

in financing.

104.    Prior to the Relevant Period, Defendant Singh founded Lavos, which provided

promotional services to its issuer clients.   Although his wife, Maria Singh, was listed as Lavos'

sole principal and managing member, she did not serve an operational role and did not use her

married name on Lavos documents.   She was instead referred to as "Maria Santos," in effect

concealing her relationship to the one true operational member and employee of Lavos, Defendant Singh.

105.   After founding Lavos, Defendant Singh began assisting Defendant Bjorlin in organizing Lidingo to work with him on promotional projects.

106.   From September 2011 through March 2014, Lidingo and Lavos together provided stock promotion services to publicly-traded companies, and such issuers would pay Lavos or Lidingo for such promotions.  In turn, Lidingo would pay writers to write and publish articles about the issuers which were published on investment websites such as *Seeking Alpha*.  During this period, Defendants Singh and Bjorlin paid at least fourteen writers to write at least 400 internet publications on investment websites.

107.   Per their arrangement, Defendant Singh would find clients for Lidingo and Lavos, including companies where Singh serves as CEO, and Defendant Bjorlin would perform the day-to-day promotional work such as coordinating the publication of articles and working with writers. Singh would also provide ideas for and edit the articles, and occasionally direct which specific writer should draft an article and where and when the article should be published.  Moreover, Singh reviewed and commented on expense reports for Lidingo, which contained details about payments to writers for Lidingo articles.

108.   Per the arrangement between Lidingo and Lavos, Lidingo would pay writers for publishing articles for both Lidingo and Lavos.  Lavos would then send part of its profits to Lidingo.  Under their agreements with each other, Defendant Singh and Lavos had a right to receive at least $1.75 million in cash and equity from the promotional activities.

109.   Defendant Bjorlin would utilize writers who would use various aliases when posting promotional articles on third party investment websites, particularly *Seeking Alpha*.

Although these ghost writers purported to be credible investment professionals, they were merely Lidingo contractors and/or employees.

110.    As part of this scheme, Defendant Singh directed Lidingo and Bjorlin directed Lidingo writers specifically to not disclose compensation.  In fact, in April 2012, Bjorlin stated to Singh that a writer "wants to disclose . . . no disclosures allowed," to which Defendant Singh responded by confirming that the writer was a "no."  On February 20, 2012, Defendant Singh sent an email to Defendant Bjorlin instructing her to tell a writer that "there would be no disclosures associated with any article."

111.    One of the companies used by Defendant Singh was ImmunoCellular Therepeutics, Ltd. ("ImmunoCellular"), which Singh was the CEO of from February 2008 through August 2012. In September 20122, ImmunoCellular became one of Lidingo's first clients when Singh hired Lidingo to do promotional work for ImmunoCellular.  During the period of time of time when Lidingo provided promotional services to ImmunoCellular, none of the articles published or caused to be published by Lidingo disclosed compensation from ImmunoCellular.  Defendant Singh had final approval authority for all the ImmunoCellular articles published while Lidingo was providing promotional services for ImmunoCeulluar, and participated in providing content and editing for the articles.

**The Stock Promotion Scheme**

112.    Beginning as early as September 2013, Lidingo was hired by Defendant Singh in order to promote the Company's stock.  The contract for such services required the Company to issue 50,000 shares of Company stock and pay $20,000 per month to Lidingo.  In 2013 and 2014, the Company paid Lidingo more than $230,000.  Over the course of the contract, the Company paid Lidingo approximately $90,000 more than the agreement required.

113.    In April 2014, the agreement was cancelled.

114.    During the course of the agreement, Lidingo would pay writers to publish articles on *WallStCheatSheet* and *Seeking Alpha* that concerned the Company's securities.  Additionally, Lidingo would publish articles about the Company on *Seeking Alpha* under pseudonyms selected by Lidingo that were ghost-written by writers paid by Lidingo.  Of the over 10 articles that the Company and Lidingo caused to be published, none disclosed the writers' or Lidingo's compensation received from the Company or disclosed that the publications were in fact part of a paid promotion.  Moreover, most of the articles published on *Seeking Alpha* made affirmative misrepresentations that the author of each respective article had not been compensated, stating that the respective author of the article was "not receiving compensation" for the article.  Examples of such articles (discussed further herein) include:

a)    Lidingo was paid $20,000 by the Company on October 10, 2013 and eight days later, under the pseudonym "The Swiss Trader," Lidingo published a ghost-written article on *Seeking Alpha* that discussed the Company's securities, titled "5 Companies Race to Develop the Next Great Melanoma Product."  Lidingo affirmatively misrepresented in the article that it was not receiving compensation for the article.

b)    Lidingo was paid $20,000 by the Company on December 3, 2013, and Lidingo then paid $600 to a writer to publish six days later an article concerning the Company's securities on *Seeking Alpha*, titled "4 Companies Developing Bockbuster Immunotherapies to Fight Cancer."  The writer, despite receiving $600 from Lidingo, affirmatively misstated that the writer was not receiving compensation for the article.

115.    In addition to receiving assistance from ghost-writers, Lidingo also received contributions from Defendant Singh, who, while acting in his capacity as the Company's CEO, contributed to, and reviewed and edited, some of the articles published by Lidingo or its writers

and at times controlled the timing of the articles' publication.  As noted in the consulting agreement between Lidingo and the Company, "DUTIES . . . . Consultant [Lidingo] will utilize only materials, reports, financial information or other documentation that is approved in writing in advance by the Company."  Examples include:

a)      In an email sent to Defendant Bjorlin on September 13, 2013, Defendant Singh attached a proposed article that discussed the Company and directed Lidingo to have the article published by a specific Lidingo writer or under the Lidingo pseudonym "The Swiss Trader."  Two weeks after sending the email, Lidingo published a version of Singh's attached article, nearly verbatim, titled "3 Companies Developing the Future of Cancer Therapy," on SeekingAlpha under the pseudonym "The Swiss Trader" and affirmatively misstated that it had not received compensation for the article.

b)      On December 31, 2013, Defendant Singh stated with regard to the draft of an article sent to him regarding the Company, "This is okay to publish.  I think I need to talk to [the writer] to explain how these technologies really work."  Later that day, via email, he instructed Bjorlin to have the writer publish the article on the following Thursday.

116.   Moreover, between September 2013 and March 2014, as part of the Stock Promotion Scheme, Lidingo, through a vendor, caused the distribution of 390,000 emails in 20 separate mailings that described the Company's stock to potential investors.  The content of the emails was provided by Lidingo, but Lidingo failed to disclose in the emails that it had received compensation from the Company or the amount of compensation it received.

117.   Defendant Singh understood that Lidingo was in the business of sending out mass emails to potential investors on behalf of stock promotion clients, such as the Company.  Additionally, Defendant Singh approved the expense incurred by the Company from having

Lidingo work with the vendor to send out the mass emails regarding the Company.

118.    Under the direction of the Individual Defendants and Defendant Bjorlin, Lidingo touted the Company's stock without disclosing that they were paid to do so by the Company, through Defendant Singh, and in all such cases the Company failed to disclose in its regulatory filings with the SEC that it paid the stock promoter for promoting the Company's stock.

119.    During the Relevant Period, the Individual Defendants and Defendant Bjorlin caused at least 14 promotional articles touting the Company to the published, which were reviewed, edited, and approved by Defendant Singh prior to being disseminated.  These articles all failed to disclose that the Company had paid for the articles tout the Company's performance and prospects, and Defendants Singh's contribution to the articles prior to their being published. Moreover, most of the articles also affirmatively made materially false and misleading statements about the Company.

### September 27, 2013 Seeking Alpha Article

120.    On September 27, 2013, an article by The Swiss Trader titled, "3 Companies Developing the Future of Cancer Therapy," was published on *Seeking Alpha*. The article was nearly a verbatim version of an article attached to an email sent by Defendant Singh to Lidingo on September 13, 2013.  The article promoted the Company's technology, stating, that "[t]umor infiltrating lymphocytes (TILs) . . . can completely eliminate all cancer in as many as 12% of metastatic melanoma patients," while a competitor technology could "only achieve a complete response rate of about 2%."  Moreover, the article stated that "TILs . . . have a better objective response rate (ORR) compared to conventional therapies: 50% vs. 11% for Yervoy."  The article even grouped the Company with Celgene and Novartis, two leaders in the biotechnology space.

121.    The article touted the outlook of companies developing T cell technology, stating,

in relevant part:

> Now, every major drug company has an antibody product on the market, and
> antibodies generate over $40 billion in sales each year. It may take time, but cell-
> based manufacturing will eventually become like an assembly line and ultimately
> profitable. And because of its market value and the upside in developing such
> products efficiently, both large and small companies continue to push forward in
> research—and as of late, have produced very strong clinical data.
>
> * * *
>
> As T cell technology progresses, manufacturing will likely improve and become much
> more efficient. Investors should definitely keep an eye out on the leaders in this space, as
> their potential upside can generate nice returns.

122.    The article also contained a disclosure concerning compensation, stating, in

relevant part:

> I am long NVS, GNBP.OB. I wrote this article myself, and it expresses my own
> opinions. I am not receiving compensation for it (other than from Seeking Alpha).
> I have no business relationship with any company whose stock is mentioned in this
> article.

### October 2, 2013 Seeking Alpha Article

123.    On October 2, 2013, an article by Brian Nichols was published on *Seeking Alpha*,

titled "Investing Smart: Biotechs, Effective Therapies and Shareholder-Friendly CEOS."  The

article touted Defendant Singh's track record at ImmunoCellular and implied that his experience

adds value for the Company's shareholders, stating, in relevant part:

> One of my favorites is Dr. Manish Singh, formerly of ImmunoCellular. Singh has
> a strong scientific background with over 10 patents under his belt, he's someone
> I've spoken with a half dozen times, and he knows how to create shareholder value.
>
> * * *
>
> I have been anxious to hear of Dr. Singh's next venture. Because, after all, he did
> take IMUC from being a $5 million OTC stock to a near $200 million company
> prior to his departure (if you invested $25,000 in IMUC in January 2009 and sold
> in July 2012, that investment grew to more than half a million dollars!) . . . .

* * *

Lion Biotechnologies currently trades at $6.50 a share with a market cap of $100 million. At first, I was highly skeptical of this company, and did not want to invest solely on the notion that Dr. Singh adds shareholder value. However, as I began to take a closer look, and really digest this company, I now believe it too might be something special.

* * *

There has been a resurgence of interest in T-cells in the last few years with very promising data showing potential cures in leukemia and significant interest from large companies such as Novartis (NVS) and Celgene (CELG) to develop this therapeutic modality. Dr. Singh is making his new bet on a new T-cell technology developed at National Cancer Institute.

* * *

[T]he data is robust, and it seems that Dr. Singh has once more struck gold.

* * *

While it is impossible to know whether or not TILs will be a success in Phase 3 trials, I think Dr. Singh has a good shot to replicate the success experienced at ImmunoCellular Therapeutics.

* * *

Like I said, management matters in biotechnology, and while having a CEO who concentrates on science is imperative, a company also needs someone with a "Wall Street edge" to add shareholder value. Dr. Singh, who was a scientist before becoming a venture capitalist and CEO, is simply taking technology that was developed by world-renowned researcher/surgeon, Dr. Steven A. Rosenberg, who is one of the most cited researchers of our generation, and adding his twist of next generation technologies and rapid development to create shareholder value.

Looking at shares of ImmunoCellular both during and after his tenure, the performance speaks for itself. And as of now, with my initial analysis, I think Dr. Singh might just replicate that performance. Now, I am not suggesting that TILs will be a future success, but I do think it has a shot, and what we know now is encouraging. As an investor that seeks deep unknown value in biotechnology, and candidates that have products with big sales potential and the potential for success, I think Lion is interesting, and I am willing to take a small chance on the success of Singh and his new company.

124.    The statements that "after all, he did take IMUC [ImmunoCellular] from being a $5 million OTC stock to a near $200 million company prior to his departure," and that Defendant Singh "adds shareholder value" were especially false and misleading since Defendant Singh increased the value of ImmunoCellular only a result of a fraudulent promotion scheme almost identical to the Stock Promotion Scheme.

125.    The article also contained a disclosure regarding compensation, stating: "I am long GALE, NBS, QCOR, JAZZ. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."

### October 18, 2013 Seeking Alpha Article

126.    On October 10, 2013, Lidingo was paid $20,000 by the Company.  On October 18, 2013, an article by The Swiss Trader was published on *Seeking Alpha*, titled "5 Companies Race to Develop the Next Great Melanoma Product."  The article touted the Company's results from early Phase 1 and Phase 2 clinical trials as "unprecedented," stating, in relevant part:

> Lion Biotechnologies is developing tumor infiltrating lymphocytes (TILs) to treat metastatic melanoma. Results from early Phase I and II clinical trials showed unprecedented results: objective response rates as high as 72% with a median duration of response of about 14 months and a complete response rate of 22% when TILs were combined with total body irradiation. The most impressive thing about this trial was 19/93 patients treated continue to be disease free over 7 years, which would be considered a cure by any measure. There are currently two ongoing NCI sponsored Phase II clinical trials (NCT01468818 and NCT01319565) to further evaluate the efficacy of TILs in treating metastatic melanoma. The company intends to initiate a Phase III registration trial in 2015. In addition, a number of combination trials using the company's technology are currently underway at major medical centers such as NCI, MD Anderson Center, and Moffitt Cancer Center. In 2014 trial data from the two sponsored trial[s] will be a major catalyst; if positive Lion will likely see its $100 million market cap appreciate in a large way.

127.    The article also provided the following disclosure regarding compensation: "I am long AMGN, GILD.  I wrote this article myself, and it expresses my own opinions.  I am not

receiving compensation for it.  I have no business relationship with any company whose stock is mentioned in this article."

### October 31, 2013 Seeking Alpha Article

128.    On October 31, 2013, an article by Brian Nichols titled "Singh Secures Lion for 2 Years & Prepares for Uplisting," was published on *Seeking Alpha*'s Instablog, where articles are not selected, edited, or screened by *Seeking Alpha* editors.  The article promoted the Company, noting that it had raised approximately $23 million in private financing and that it was following in the footsteps of ImmunoCellular, Defendant Singh's prior company.  With regard to ImmunoCellular, the article stated, in relevant part:

> I believe it was November of 2011 when I first bought shares of ImmunoCellular Therapeutics (NYSEMKT:IMUC). Clearly, the data was good, and the investment has performed well, but there are always questions regarding the legitimacy of a small biotechnology company. I performed research, assessed the risk to reward, and over a period of time had several conversations with Dr. Manish Singh.

> Singh took IMUC from a small $5 million company to a $200 million company. Since his departure from IMUC, its stock has lost value. Hence, I have always admired his willingness to create shareholder value, so I bought shares in his new company Lion Biotechnologies (OTCQB:LBIO) at $5 a share.

129.    The article noted that the financing received by the Company was a "game changer" and that Defendant Singh's strategy could "make this company special," stating, in relevant part:

> With that said, I am writing this instablog in response to what I believe is a game changer. My initial concern with Lion was that the company had no cash. Singh essentially had to start from scratch, and my belief was that he'd be lucky to raise $5-$10 million in his first financing attempt. But today (October 31) the company announced that it has entered into definitive agreements with institutional and other accredited investors to raise approximately $23 million in a private financing.

> So, why am I posting an instablog and making a big deal about this agreement. Honestly, it is not really worthy of a published article but I am impressed because of its size. With this deal, Singh shows that investors are willing to follow him into an investment.

This financing completely transforms the company. It is being backed by strong life science funds and gives the company two years of cash, which is significant because previously they didn't have any cash. As a result, this strengthens the investment outlook, and gives investors a reason to be optimistic.

* * *

Lastly, I am impressed that Singh is following his previous pattern at IMUC. Lion is an OTC stock, but with this financing and its market cap near $100 million we can expect an uplisting to the NASDAQ just like with IMUC under Singh's leadership. With all things considered, I think this financing could be an interesting discussion point. Personally, part of my value investing strategy revolves around management (i.e. XPO Logistics (NYSE:XPO) has been my largest position since Bradley Jacobs took over three years ago).

Therefore, I believe that Singh can make this company special with his operational strategy, and that this financing is the first step in creating long-term shareholder value.

130.    The comment that "Singh took IMUC from a small $5 million company to a $200 million company" was particularly false and misleading given the fact that Defendant Singh increased the value of ImmunoCellular only by engaging in a promotion scheme almost identical to the Stock Promotion Scheme.

### November 12, 2013 Seeking Alpha Article

131.    On November 12, 2013, an article by Brian Nichols was published on *Seeking Alpha*, titled "Combination Therapies Hold Key to Future Cancer Treatments."   The article compared the Company to Bristol-Meyers, Merck, and Roche, three of the biggest biotechnology companies in the industry, and presented the Company as one about which there is "real reason" to be "excited."   The article stated, in relevant part:

At $3.55 Lion has a market cap of just $65 million. While there are risks associated with such a small company, Singh recently completed a private financing that gave the company net proceeds of $21.6 million. Thus giving Lion more than two years worth of operating cash. Also, the company's data is robust, having treated 136 patients at four well respected sites. In fact, such data is far superior to what we've seen among competing companies in treating cancer, those that have higher market caps, including Singh's previous company ImmunoCellular Therapeutics with just

16 patients. While there are no guarantees that Singh's company can replicate its clinical data in an even larger study, investors have to like the combined effect of a larger number of strong T-cells and anti-PD-1s, both of which have shown consistent response rates in the 30%-50% range.

* * *

Companies such as Merck, Bristol-Myers, Roche, AstraZeneca and then smaller companies such as Lion, have an opportunity to control a space that is much larger than anything being developed by the industry's elite. Thus, when I say a paradigm shift, we are not only seeing survival increase from months to years, but also in the way the market views companies developing such therapeutics. In the past, with very little progress and innovation being made, there was no reason to get too excited about new therapeutics. Today, there is real reason to be excited, and this could lead to a shift in which companies the market rewards with large valuation premiums, those such as Merck and possibly Lion at some point in the future.

132.    The article also tied Defendant Singh to purported success at ImmunoCellular, stating, "One of the most notable small companies that is testing this approach might be Lion Biotechnologies (OTCQB:LBIO) helmed by Dr. Manish Singh.  Singh was formerly the CEO of ImmunoCellular Therapeutics (IMUC) and made famous his multiple-antigen targeting approach at a time when immunotherapy was stealing the biotechnology spotlight."

133.    The article also provided the following disclosure regarding compensation: "I am long IMUC, MRK, OTCQB:LBIO.  I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha).  I have no business relationship with any company whose stock is mentioned in this article."

134.    The day after the article was published, Nichols responded to comments on the article, and touted Defendant Singh as a "shareholder friendly CEO."

**November 25, 2013 Seeking Alpha Article**

135.    On November 25, 2013, an article by Brian Nichols titled, "Lion Biotechnologies: 3 Bullish Reasons Why I Like This Speculative Biotech," was published on *Seeking Alpha*.  In

40

promoting the Company's stock, Nichols wrote, "I'm bullish on a very small and new company

called Lion Biotechnologies (OTCQB:LBIO), and there are three reasons in particular."

136.    As the first reason, Nichols noted "robust data" suggesting that the Company's

technology may prove successful in larger scale studies, stating, in relevant part:

> Now, on paper nearly all biotechnology companies sound good, but as you look
> closer investors or biotech experts can usually find mishaps or problems with a
> technology. In the case of TILs, Lion is targeting the most aggressive form of
> melanoma in those patients who have not responded to other treatments. In this
> setting, TILs produced a 50% response rate including a 22% complete response. If
> this data holds, it would be the best data we've ever seen in fighting the disease.

> However, biotech investors must admit that many companies produce robust data
> in early stage testing, which then fizzles out in larger studies. Therefore, I was very
> skeptical when I first saw the data. But then I saw that TILs have already been
> tested on 136 patients at four different trials including MD Anderson and NCI. This
> means that Lion has robust data or a large patient population to draw conclusions
> from. In fact, 19 of the 20 patients who saw a complete response are still alive after
> 6 to 9 years. For this reason, I am bullish on the chances of TILs moving forward.

137.    As his second reason, Nichols noted Defendant Singh's purported success with

ImmunoCellular in touting his creating "value for shareholders," stating, in relevant part:

> Like I said, Lion is a small company, one that I would have never noticed if not for
> news that Manish Singh was the CEO, after essentially taking over the board.
> Personally, I am a big believer of investing in management, and Singh has a history
> of creating value for shareholders in the clinical biotechnology setting.

> Singh was previously the CEO at ImmunoCellular Therapeutics (IMUC), where he
> took a $6 million OTC company and got it listed on the NASDAQ with a market
> cap of $200 million. Therefore, his involvement and merger to create Lion is what
> sparked my interest, but the data itself is what determined my investment.
> Moreover, with CEOs who are methodical in nature or have a history in financial
> markets, investors can almost predict future movements.

> Lion is very similar to ImmunoCellular Therapeutics in the initial years with Singh,
> although Lion has more robust data. At ImmunoCellular, one of Singh's goals was
> to uplist the stock from the OTC markets to the NYSE, which he did in May 2012.
> As a result, shares of ImmunoCellular soared from $2.80 to $4.00, which then
> consequently led to its inclusion into the Russell Index Funds.

At Lion, I expect the same. The company already has a market cap of $80 million and has crossed the $100 million threshold several times in its short-lived existence. In company presentations, Singh has discussed upcoming milestones, which include his plans to list on the NASDAQ in Q1 of 2014. If so, this would be a major catalyst, also just before the Russell indexes rebalance. Thus, it could be a repeat of the performance we saw at ImmunoCellular.

138.    As his third reason, Nichols noted that "in just a few months Singh has already secured $23.3 million in private financing" and "Lion has enough cash to operate for the better part of two years, which is something that not many sub-$100 million biotechs can claim."

139.    In conclusion, Nichols noted he believed the short/medium-term outlook of the Company is bullish, stating, in relevant part:

And considering that Lion has robust data, enough cash for two years, and catalysts such as a potential NASDAQ uplisting, I think the short/medium-term outlook is bullish. . . . In my opinion, after thoroughly studying this company, I think it has some of the best upside potential in the sub-$100 million biotech market, and that Singh's involvement gives Lion a good chance to trade higher in the year ahead.

140.    The comments suggesting Defendant Singh's "history of creating value for shareholders in the clinical biotechnology setting" were particularly false and misleading given the fact that Defendant Singh increased the value of ImmunoCellular only by engaging in a promotion scheme almost identical to the Stock Promotion Scheme.

141.    The article also provided the following disclosure regarding compensation: "I am long OTCQB:LBIO, IMUC.. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."

### December 2, 2013 WallStCheatSheet Article

142.    On December 2, 2013, Tom Meyer published an article on *WallStCheatSheet* titled, "2 Biotech Stocks Facing Major Catalysts in 2014." The article boasted that "[a]s of Friday's closing price of $8.42, shares have soared by nearly 80 percent since November 1 on expectations

that the company's technology and catalysts in 2014 will turn Lion Biotechnologies into one of the premier biotechnology companies in the world." Moreover, the article noted that the Company was one of "[t]wo biotech stocks facing major catalysts in 2014[.]"

143.    The article also implored investors to buy Company stock now before "catalysts in 2014" would cause the Company's stock to soar, stating, in relevant part:

> Based on all of the above catalysts, Lion Biotechnologies is going to be extremely busy over the coming 12 months. The catalysts that have the most potential to send share prices soaring include the uplisting, the IND for Next-Gen T-cells, and the Phase 1 data on combination trials.
>
> * * *
>
> Based on these numbers, Lion Biotechnologies estimates that it could generate $1 billion in annual revenue at its peak sales of TIL therapy (based on the projected melanoma market in 2018, which amounts to $4 billion). Based on this potential and the number of catalysts in 2014, investors may want to consider getting in now before it's too late.

144.    The comment made in the article that the Company's shares have soared "on expectations that the company's technology and catalysts in 2014 will turn Lion Biotechnologies into one of the premier biotechnology companies in the world" was particularly false and misleading given the fact that the real reason the Company's stock price was soaring was the Stock Promotion Scheme.

### December 9, 2013 Seeking Alpha Article

145.    On December 3, 2013, Lidingo was paid $20,000 by the Company, and Lidingo subsequently paid $600 to a writer to publish an article about the Company's securities. On December 9, 2013, an article was published on *Seeking Alpha*, titled "4 Companies Developing Blockbuster Immunotherapies to Fight Cancer," under the pseudonym Glen S. Woods. The article compared the Company to Bristol-Myers Squibb, Merck, and Roche, three of the biggest biotechnology companies in the industry. The article also highlighted Defendant Singh's previous

purported success with ImmunoCellular, stating, "Manish Singh, Ph.D., President and Chief Executive of Lion—who previously helmed ImmunoCellular Therapeutics (NYSEMKT:IMUC), taking it from a tiny OTC $6 million company to an almost $200 million dollar compan[y]."

146.   The article moreover promoted the stock by noting the Company's recent price increase and its ability to finance it operations for at least the next two years, stating, in relevant part:

> I like the investment potential of Lion. The stock has been on a tear the past few sessions, closing on Friday. Dec. 6th at $11 per share. The company has a market cap of $170 million, and is developing a platform that could be worth billions per year. However, a major concern about any development biotech company is the ability to sustain its existence while developing its product. In November the company completed a private financing with gross proceeds of $23.3 million, netting the company approximately $21.6 million. The money was raised to secure the funds for Contego's phase III study as well as sponsor several other studies. Lion estimates a burn rate of $10 million from the 4th quarter 2013 to 4th quarter 2014, giving the company enough working capital to operate for the next two years.

147.   The article also noted that the author saw the Company as one that giant pharmaceutical companies may be interested in, stating, "[G]iven the positive results of the phase II study I see Lion as an interesting play, not only as a longer-term investment, but also as a company that might be of interest to one of the giant pharmaceutical companies looking for collaboration or perhaps a buy-out."

148.   The article further noted that the Company "has the potential for large gains if more positive news comes from its future clinical trials."

149.   The article also provided the following disclosure regarding compensation:

> I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours.  I wrote this article myself, and it expresses my own opinions.  I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.

150.    The comments made in the article noting that the "stock has been on a tear" and Defendant Singh's purported success with ImmunoCelluar were particularly false and misleading given that the Company's stock was due to the Stock Promotion Scheme and that Defendant Singh was only able to increase ImmunoCellular's value by engaging in a promotion scheme almost identical to the Stock Promotion Scheme.

### December 23, 2013 Seeking Alpha Article

151.    On December 23, 2013, an article by Brian Nichols was published on *Seeking Alpha*, titled "4 Stocks in 4 Industries That Could Make Significant Gains in 2014."  The article stated that "[i]mpressive gains have already been seen since . . . [the Company's] merger [with Genesis], and 2014 should continue [] that trend."

152.    The article moreover highlighted catalysts that would purportedly improve the Company's stock price, stating, in relevant part:

> Now that you know the story and familiarized with the data, let's look at the catalysts and what makes Lion a potential double in 2014. According to the company's latest presentation, it needed approximately $10 million of cash to fund operations through the fourth quarter of 2014; Lion completed private financing and now has nearly $24 million. Therefore, it has enough cash for two years, which eliminates the overhang or fear of short-term dilution.
>
> * * *
>
> Lion will give an update on its Phase 2 trial in the first quarter and then plans to meet with the FDA to begin Phase 3 testing, both of which will be major catalysts. Also, the company will complete licenses and submit an IND for its next-generation TILs and present data on its study with Zelboraf. Collectively, these catalysts could create a nice boost for shares of Lion, especially with a $135 million market cap.
>
> * * *
>
> Additionally, investors should really like the amount of data that Lion has presented thus far, as most $135 million biotechnology companies have only early stage data, usually collected at one site. This data tends to be compared to historical averages. But the TILs data mirrors that of billion-dollar biotechs with multiple trial sites, robust patient data, and multiple years of follow-up analysis. Therefore, investors

should really like what they see heading into 2014, as this little unknown biotech might very well be on everyone's radar by next year's end, with a steady dose of catalysts to push it significantly higher.

153.    The article also noted the Company's intention to list its stock on the NASDAQ as an additional reason to invest in the Company's stock, stating, in relevant part:

Currently, Lion is an OTC stock. But according to the company's presentation, Lion will seek a listing on the NASDAQ in the first quarter of 2014. With a price of $9.00 and a market capitalization of $135 million, it is likely that Lion is uplisted early next year. Clearly, by going from OTC to the NASDAQ, Lion will be visible to a larger audience of shareholders; and if completed by the first quarter, it will also be eligible for fund inclusion and also indexes like the Russell. These combined will serve as stock moving catalysts in early 2014.

154.    The article provided the following disclosure concerning compensation: "I am long RH, OTCQB:LBIO. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."

### *January 15, 2014 Seeking Alpha Article*

155.    On December 31, 2013, Defendant Singh commented on a draft article concerning the Company, stating, "[t]his is okay to publish.  I think I need to talk to [the writer] to explain how these technologies really work."  He then instructed Defendant Bjorlin to publish the article. On January 15, 2014, an article titled "Are Modified T-Cells a Game Changer in Treating Cancer?" was published on *Seeking Alpha* under the pseudonym The Swiss Trader.  The article described the Company's technology and why it may be a "game changer."  In touting the Company's stock, the article stated, in relevant part:

Lion, along with its promising trial data, is worthy of your attention. This is a good stock to follow.

At this very moment, Lion is worth the attention that it has received. And if Novartis' data holds, we might learn that Lion too will see strong data in its Phase 3 trial, which would produce very large returns for shareholders.

156.    The article also provided the following disclosure concerning compensation: "I am long LBIO,. [sic] I wrote this article myself, and it expresses my own opinions.  I am not receiving compensation for it.  I have no business relationship with any company whose stock is mentioned in this article."

### February 6, 2014 Seeking Alpha Article

157.    On February 6, 2014, an article by Brian Nichols was published on *Seeking Alpha*, titled, "Combination Therapies: Where Immuno-Oncology Is Headed and How To Invest." The article listed the Company as one of three with potentially positive prospects, stating, in relevant part:

> Keeping this in mind, part of being a good investor in this industry is foreseeing certain trends, using known information to predict where the industry might be headed. While Celldex, MacroGenics, and Lion all look to be developing promising candidates with the potential for widely used combination agents, this outlook is likely barely scratching the surface, as the gains to be created from such innovation is possibly unimaginable at this very moment. Accordingly, invest in the companies with strong data that have the most to gain as this industry continues to innovate and transition from delaying the inevitable to finding an actual cure.

158.    The article also provided the following disclosure concerning compensation: "I am long LBIO, CLDX, BMY. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."

### February 10, 2014 Seeking Alpha Article

159.    On February 10, 2014 an article titled "2 Young 'Cats' of Biotech Poised to Climb Higher in 2014," was published on *Seeking Alpha* under the pseudonym Glen S. Woods.  The article repeatedly noted that the Company's stock price should increase significantly and that the Company was undervalued, stating, in relevant part:

I think Dr. Singh has a very good chance of striking gold again with Lion.

\* \* \*

[I]f there are any rumbles of such action this stock should move significantly higher.

\* \* \*

Lion is a $105 million market cap company. It is a pure development company and has come a long way in a very short time. As the company grows the stock could experience swings, as shown recently when the stock was hit hard. The stock drop was probably due to profit taking and investors exercising warrants from the earlier financing deal. However, the company is now in a better financial position, with $23 million in cash. That should keep Lion operational for the next 24 months, thus reducing the risk of financing in the future, and stock dilution for quite some time. Lion stock closed on February 4th at $5.00 per share, which makes it an excellent entry point.

\* \* \*

Lion is not as advanced, but if 2013 is any indication of the direction the company will take in 2014, I think the company is well undervalued. And if a collaboration deal is struck, this stock could move considerably higher. Only time will tell which of the two biotech cats will be king of the biotech jungle.

160.   The comments that "Lion is not as advanced, but if 2013 is any indication of the direction the company will take in 2014, I think the company is well undervalued," and "I think Dr. Singh has a very good chance of striking gold again with Lion," were particularly false and misleading since the reason the Company's share price increased in 2013 was due to the Stock Promotion Scheme.

### *February 18, 2014 theCheatSheet.com Article*

161.   On January 20, 2014, Defendant Singh sent an idea for an article concerning the Company's securities to Lidingo.  Consequently, on February 18, 2014, an article was published on *theCheatSheet.com*, titled "Immune Checkpoint Blocker Race Heats Up," under the pseudonym John Rivers.  The article touted the Company's technology, and prompted investors to "keep an

eye on not only the checkpoints blockers alone, but also what other immunotherapies [such as Lion's technology] that are partnered with them."

162.    The article failed to disclose the compensation received by the author for writing and publishing the article and failed to disclose that the article was part of a paid promotion.

### *March 1, 2014 Seeking Alpha Article*

163.    On March 1, 2014, an article by Brian Nichols was published on *Seeking Alpha*, titled    "Modified T-Cells: Quietly Becoming Very Relevant."  The article touted the Company, stating "if data holds in larger trials, we could be talking about massive gains for Lion . . . ."

164.    The article moreover provided the following disclosure regarding compensation: "I have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."

165.    The Individual Defendants breached their fiduciary duties by directly and/or indirectly causing Lidingo to publish these articles and disseminate the aforementioned emails, which failed to disclose that they were part of the Stock Promotion Scheme and led to the artificial inflation of the Company's stock price, and Defendant Bjorlin aided and abetted such misconduct.

166.    The Individual Defendants also breached their fiduciary duties by concealing this wrongdoing long after the agreement with Lidingo was terminated.

167.    The Individual Defendants were surely aware during the Relevant Period that Lidingo was a company that had already been accused of engaging in illegal stock promotion activities, as it was implicated in an SEC investigation involving the illegal stock promotion of Galena Biopharma, Inc. ("Galena"), captioned *In the Matter of Galena Biopharma, Inc.*, File No.

HO 12356.  In fact, pursuant to this investigation, the Company received a subpoena from the SEC on April 23, 2014.  Galena's board of directors created a special committee to investigate the SEC's allegations, and ultimately found and publicly disclosed that Lidingo was engaged in illegal stock promotion activities.  The SEC's subpoena and the fact that Galena operated in the same space as Iovance, make clear that the Individual Defendants were or should have been aware of the Stock Promotion Scheme.   Indeed, Defendant Hillsberg is also on Galena's board of directors.

### False and Misleading Statements in Iovance's SEC Filings and Press Releases

#### *October 23, 2013 Form 10-Q*

168.    On October 23, 2013, the Company filed a quarterly report for the fiscal period ended June 30, 2013 on a Form 10-Q with the SEC (the "2Q 2013 10-Q"), which was signed by Defendants Singh and Handelman.  In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.  Thus, the 2Q 2013 10-Q provided a misleading portrayal of the Company's business, operations, and prospects when it provided the Company's operating results for the second fiscal quarter 2013, stating, in relevant part:

*Revenues*

As a development stage company that is currently engaged in the development of therapeutics to fight cancer, we have not yet generated any revenues from our biopharmaceutical business or otherwise since our formation.  We currently do not anticipate that we will generate any revenues during 2013 from the sale or licensing of any products.

*Operating Expenses*

Operating expenses include compensation-related costs for our employees engaged to general and administrative activities, legal fees, audit and tax fees, consultants and professional services, and general corporate expenses. Our operating expenses were $434,913 and $2,250,000 for the three months ended March 31, 2013 and 2012, respectively . . . .

*Research and Development.*

Research and development expenses are primarily comprised of amounts payable to (i) the National Institutes of Health under terms of our license agreement, and (ii) NCI under the CRADA. Research and development costs were $270,000 and $886,000 for the three months ended March 31, 2013 and 2012, respectively . . . . Our goal is to substantially increase our research and development activities in the near future in order to accelerate the development of our technologies. However, the amount of our future research and development activities, and the amount of our future expenses, will depend upon the amount of funds that we have available.

169.    Attached to the 2Q 2013 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Singh and Handelman attesting to the accuracy of the 2Q 2013 10-Q.

### *November 14, 2013 Form 10-Q*

170.    On November 14, 2013, the Company filed a quarterly report for the fiscal period ended September 30, 2013 on a Form 10-Q with the SEC (the "3Q 2013 10-Q"), which was signed by Defendants Singh and Handelman. In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls. Thus, the 3Q 2013 10-Q provided a misleading portrayal of the Company's business, operations, and prospects when it provided the Company's operating results for the third fiscal quarter 2013, stating, in relevant part:

*Revenues*

As a development stage company that is currently engaged in the development of therapeutics to fight cancer, we have not yet generated any revenues from our biopharmaceutical business or otherwise since our formation. We currently do not anticipate that we will generate any revenues during 2013 from the sale or licensing of any products.

*Operating Expenses*

Operating expenses include compensation-related costs for our employees dedicated to general and administrative activities, legal fees, audit and tax fees, consultants and professional services, and general corporate expenses. Operating expenses were $2,459,000 and $1,377,000 for the three months ended September

30, 2013 and 2012, respectively. Operating expenses were $3,673,000 and $5,004,000 for the nine months ended September 30, 2013 and 2012, respectively.

Our operating expenses during the three months ended September 30, 2013 increased by $1,082,000 compared to the three months ended September 30, 2012, primarily as a result of the increase in non-cash compensation we incurred for the three months ended September 30, 2013. The total amount of such non-cash compensation we incurred during the three months ended September 30, 2013 was $2,140,000 compared to $698,000 for the three months ended September 30, 2012.

*Research and Development.*

Research and development expenses are primarily comprised of amounts payable to (i) the National Institutes of Health under terms of our license agreement, and (ii) the NCI under the CRADA.  Research and development costs were $250,000 for both of the three month periods ended September 30, 2013 and 2012, respectively.  Research and development costs were $770,000 and $1,406,000 for the nine months ended September 30, 2013 and 2012, respectively . . . .  Our goal is to substantially increase our research and development activities in the near future in order to accelerate the development of our technologies. However, the amount of our future research and development activities, and the amount of our future expenses, will depend upon the amount of funds that we have available.

171.    Attached to the 3Q 2013 10-Q were SOX certifications signed by Defendants Singh and Handelman attesting to its accuracy.

**December 4, 2013 Form S-1 and Prospectus**

172.    On December 4, 2013, the Company filed a Registration Statement on Form S-1 with the SEC, which was subsequently amended on January 7, 2014 and January 21, 2014, with the January 21, 2014 Amended Registration Statement, which was signed by Defendants Singh, Handelman, McPeak, Venkatesan, and Hillsberg, having been declared effective on January 30, 2014.

173.    The Prospectus for the offering (collectively with the December 4, 2013 Registration Statement, the January 7, 2014 Amended Registration Statement, and the January 21, 2014 Amended Registration Statement, the "January Offering Documents") was published the same day noting 24,017,456 shares of common stock being offered, of which 3,895,300 shares

were outstanding shares of common stock owned by some of the Company's shareholders, 7,750,000 shares of common stock issuable upon the conversion of currently outstanding shares of the Company's Series A Convertible Preferred Stock owned by some of the Company's shareholders, and 12,372,156 shares issuable upon the exercise of currently outstanding common stock purchase warrants held by some warrantholders.

174.    The January Offering Documents noted possible fluctuations in the Company's stock price, but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes such fluctuations, stating, in relevant part:

***The market price of our stock may be adversely affected by market volatility.***

The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:

- announcements of the results of clinical trials by us or our competitors;

- developments with respect to patents or proprietary rights;

- announcements of technological innovations by us or our competitors;

- announcements of new products or new contracts by us or our competitors;

- actual or anticipated variations in our operating results due to the level of development expenses and other factors;

- changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;

- conditions and trends in the pharmaceutical and other industries;

- general economic, political and market conditions and other factors; and

- the occurrence of any of the risks described in this prospectus.

***March 28, 2014 Form 10-K***

175.    On March 28, 2014, the Company filed an annual report for the fiscal period ended December 31, 2013 on a Form 10-K with the SEC (the "2013 10-K"), which was signed by Defendants Singh, Handelman, McPeak, Venkatesan, and Hillsberg.   In it, the Individual

Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls. Thus, the 2013 10-K provided a misleading portrayal of the Company's business, operations, and prospects when it provided the Company's operating results for the fiscal year 2013, stating, in relevant part:

Revenues

As a development stage company that is currently engaged in the development of therapeutics to fight cancer, we have not yet generated any revenues from our biopharmaceutical business or otherwise since our formation. We currently do not anticipate that we will generate any revenues during 2014 from the sale or licensing of any products.

Costs and expenses

*Operating Expenses.* Operating expenses include compensation-related costs for our employees dedicated to general and administrative activities, legal fees, audit and tax fees, consultants and professional services, and general corporate expenses. Our operating expenses were $4,655,149 and $6,476,546 for the fiscal years ended December 31, 2013 ("fiscal 2013") and 2012 ("fiscal 2012"), respectively. Our operating expenses in fiscal 2013 decreased by $1,821,397 compared to fiscal 2012 primarily as a result of the reduction of $1,449,499 of consulting expenses . . . . In addition, in late fiscal 2013 our wages, legal, accounting and other professional fees increased substantially as we increased our operating activities and expenses pending the completion of our fundraising efforts. Since the Private Placement, we have engaged additional employees and consultants, which will increase the amount of cash compensation we will pay in 2014 and thereafter.

*Cost of Lion Transaction (Related Party).* In July 2013, we entered into an Agreement and Plan of Merger (the "Lion Agreement") with Lion Biotechnologies, Inc., a privately held Delaware corporation. Under the Lion Agreement, Lion Biotechnologies, Inc.'s stockholders received, in exchange for all of their issued and outstanding shares of common stock, an aggregate of 1,340,000 shares of our common stock with a fair value of $6,700,000. Under the Lion Agreement, we also were obligated to issue an additional 1,350,000 shares of common stock upon the achievement of certain milestones related to our financial performance and position). These other milestones were achieved in the fourth quarter of 2013 and, as a result, we issued all 1,350,000 shares (having a fair value of $9,956,250) in 2013. The value of the shares issued under the Lion Agreement was recognized and recorded as an expense in 2013. The purpose of the Lion Agreement was to acquire access to technical and managerial resources to build our current and future products, which we believed would enhance or future operations and enable us to obtain additional funding. . . .

*Research and Development.*  Research and development costs were $1,329,367 for the year ended December 31, 2013, as compared to $1,656,000 in fiscal 2012 . . . . We intend to engage in substantial research and development activities in the future, which activities are expected to increase our annual research and development expenses. However, the amount of our future research and development activities, and the amount of our future expenses, is still uncertain and will, to a certain extent, depend upon the amount of funds that we have available.

176.    The 2013 10-K also commented on risks related to the Company's securities, but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes price fluctuations, stating, in relevant part:

**The market price of our stock may be adversely affected by market volatility.**

The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:

- announcements of the results of clinical trials by us or our competitors;

- developments with respect to patents or proprietary rights;

- announcements of technological innovations by us or our competitors;

- announcements of new products or new contracts by us or our competitors;

- actual or anticipated variations in our operating results due to the level of development expenses and other factors;

- changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;

- conditions and trends in the pharmaceutical and other industries;

- general economic, political and market conditions and other factors; and

- the occurrence of any of the risks described in this Annual Report.

177.    Attached to the 2013 10-K were SOX certifications signed by Defendants Singh and Handelman attesting to its accuracy.

**May 14, 2014 Form 10-Q**

178.    On May 14, 2014, the Company filed a quarterly report for the fiscal period ended March 31, 2014 on a Form 10-Q with the SEC (the "1Q 2014 10-Q"), which was signed by

Defendants Singh and Handelman.  In it, the Individual Defendants failed to disclose: (1) the Stock

Promotion Scheme; and (2) that the Company failed to maintain internal controls.  Thus, the 1Q

2014 10-Q provided a misleading portrayal of the Company's business, operations, and prospects

when it provided the Company's operating results for the first fiscal quarter 2014, stating, in

relevant part:

### Revenues

As a development stage company that is currently engaged in the development of therapeutics to fight cancer, we have not yet generated any revenues from our biopharmaceutical business or otherwise since our formation.  We currently do not anticipate that we will generate any revenues during 2014 from the sale or licensing of any products.

### Operating Expenses

Operating expenses include compensation-related costs for our employees engaged to general and administrative activities, legal fees, audit and tax fees, consultants and professional services, and general corporate expenses. Our operating expenses were $1,957,000 and $435,000 for the three months ended March 31, 2014 and 2013, respectively.  Our operating expenses during the three months ended March 31, 2014 increased by $1,522,000 compared with the three months ended March 31, 2013, due to the increase in our operating activities and to an increase in the amount of non-cash share-based compensation costs. In the fiscal quarter ended March 31, 2014, we incurred $1,071,000 of non-cash share based compensation costs, compared to $87,000 of such costs incurred for the three months ended March 31, 2013 . . . .  During the fiscal quarter ended March 31, 2013, we conducted virtually no operations and had limited staff.  Since raising a total of $23,290,600 from the sale of our securities in the Private Placement on November 5, 2013, we have significantly increased our operations and have hired four additional employees and contractors . . . .  As a result of our increased operating activities, our larger payroll and our planned Florida facilities, our operating expenses in the future are expected to continue to increase.

### Research and Development.

Research and development expenses are primarily comprised of amounts payable to (i) the National Institutes of Health under terms of our license agreement, and (ii) NCI under the CRADA.  Research and development costs were $303,000 and $270,000 for the three months ended March 31, 2014 and 2013, respectively . . . . In 2014 our research and development costs also included $33,000 of unpaid past prosecution costs. Our goal is to substantially increase our research and

development activities in the near future in order to accelerate the development of our technologies.

179.     The 1Q 2014 10-Q also stated that "[t]here have been no material changes from the risk factors previously disclosed in the [2013 10-K]," but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes fluctuations in the price of the Company's securities.

180.     Attached to the 1Q 2014 10-Q were SOX certifications signed by Defendants Singh and Handelman attesting to its accuracy.

***August 8, 2014 10-Q***

181.     On August 8, 2014, the Company filed a quarterly report for the fiscal period ended June 30, 2014 on a Form 10-Q with the SEC (the "2Q 2014 10-Q"), which was signed by Defendants Singh and Handelman.  In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.  Thus, the 2Q 2014 10-Q provided a misleading portrayal of the Company's business, operations, and prospects when it provided the Company's operating results for the second fiscal quarter 2014, stating, in relevant part:

*Revenues*

We are currently engaged in the development of therapeutics to fight cancer and have not yet generated any revenues from our biopharmaceutical business or otherwise since our formation.  We currently do not anticipate that we will generate any revenues during 2014 from the sale or licensing of any products.

*Operating Expenses*

Operating expenses include compensation-related costs for our employees engaged in general and administrative activities, legal fees, audit and tax fees, consultants and professional services, and general corporate expenses.  Our operating expenses for the three months ended June 30, 2014 and 2013, were $1,749,000 and $779,000, respectively.  Our operating expenses during the three months ended June 30, 2014 increased by $970,000 compared with the three months ended June 30, 2013 due to the increase in our operating activities, higher legal fees, and to an increase in the amount of non-cash share-based compensation costs. In the fiscal quarter ended June 30, 2014, we incurred $693,000 of non-cash share based compensation costs,

compared to $87,000 of such costs incurred for the three months ended June 30, 2013. Share based compensation includes stock options and shares of restricted stock granted to our executive officers, our employees, our directors, and our consultants and advisors. In the June 30, 2014 fiscal quarter, we incurred increased legal fees compared to the comparable 2013 fiscal quarter for counsel related to patent and licensing issues, and in connection with responding to the SEC's subpoena for certain documents and materials . . . .

*Research and Development.*

Research and development expenses to date have been primarily comprised of amounts paid to (i) the National Institutes of Health under terms of the License Agreement, and (ii) the NCI under the CRADA. We are required to pay $250,000 per quarter under the CRADA and the $20,000 annual minimum payments to the NIH under the NIH licensing agreement. Accordingly, these $250,000 quarterly payments represented most of our research and development expenses during the three and six month periods ending June 30, 2013 and 2014. However, in the three- and six-months periods ended June 30, 2014 we also incurred $33,000 of patent prosecution costs and $111,000 of research and development costs . . . .

182.    The 2Q 2014 10-Q also stated that "[t]here have been no material changes from the risk factors previously disclosed in the [2013 10-K]," but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes fluctuations in the price of the Company's securities.

183.    Attached to the 2Q 2014 10-Q were SOX certifications signed by Defendants Singh and Handelman attesting to its accuracy.

**September 11, 2014 Amended Registration Statement**

184.    On September 11, 2014, the Company filed a Post-Effective Amendment No.1 to its Form S-1 Registration Statement declared effective on January 30, 2014, signed by Defendants Singh, Handelman, McPeak, Venkatesan, Hillsberg, and Singh, to include audited financial statements and notes. The September 11, 2014 Registration Statement was declared effective by the SEC on September 29, 2014, and the related Prospectus for the offering was filed the next day on September 30, 2014, for 20,989,625 shares of common stock (together, the "September Offering Documents").

185.    In the September Offering Documents, the Company noted potential fluctuations in its stock price as a possible risk, but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes such fluctuations, stating, in relevant part:

**The market price of our stock may be adversely affected by market volatility.**

The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:

- announcements of the results of clinical trials by us or our competitors;

- developments with respect to patents or proprietary rights;

- announcements of technological innovations by us or our competitors;

- announcements of new products or new contracts by us or our competitors;

- actual or anticipated variations in our operating results due to the level of development expenses and other factors;

- changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;

- conditions and trends in the pharmaceutical and other industries;

- general economic, political and market conditions and other factors; and

- the occurrence of any of the risks described in this prospectus.

*September 23, 2014 Proxy Statement*

186.    On September 23, 2014, the Company filed the 2014 Proxy Statement with the SEC, which failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.  The 2014 Proxy Statement was also false and misleading in stating that the Code of Ethics was adopted by the Board and that it applies to the Company's officers, directors and employees, in light of the violations of the Code of Ethics engaged in by the Individual Defendants, including through the false and misleading statements, insider trades, and the Stock Promotion Scheme discussed herein.

*November 13, 2014 Form 10-Q*

187.   On November 13, 2014, the Company filed a quarterly report for the fiscal period ended September 30, 2014 on a Form 10-Q with the SEC (the "3Q 2014 10-Q"), which was signed by Defendants Singh and Handelman.  In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.  Thus, the 3Q 2014 10-Q provided a misleading portrayal of the Company's business, operations, and prospects when it provided the Company's operating results for the third fiscal quarter 2014, stating, in relevant part:

### Revenues

As a development stage company that is currently engaged in the development of therapeutics to fight cancer, we have not yet generated any revenues from our biopharmaceutical business or otherwise since our formation.  We currently do not anticipate that we will generate any revenues during the remainder of 2014 or in 2015 from the sale or licensing of any products.

### Operating Expenses

Operating expenses include compensation-related costs for our employees engaged in general and administrative activities, legal fees, audit and tax fees, consultants and professional services, and general corporate expenses.  Our operating expenses for the three months ended September 30, 2014 and 2013, were substantially unchanged, at $2,449,000 in the three-month period ended September 30, 2014, and $2,459,000 in 2013 . . . .  In the September 30, 2014 fiscal quarter, we incurred increased legal fees compared to the comparable 2013 fiscal quarter for legal services related to patent and licensing issues, and in connection with responding to the SEC's subpoena for certain documents and materials.

### Cost of Lion Transaction.

In July 2013, we acquired Lion Biotechnologies, Inc., a privately held Delaware corporation, in the Lion Merger.  In the Lion Merger, the stockholders of Lion Biotechnologies, Inc. received an aggregate of 1,340,000 shares of our common stock with a fair value of $6,700,000.  The value of the shares issued in the Lion Merger was recognized and recorded as an expense in the three-month period ended September 30, 2013.  No such expense was incurred in 2014.

### Research and Development.

Research and development expenses to date have been primarily comprised of amounts paid to (i) the National Institutes of Health under terms of the License Agreement, and (ii) the NCI under the CRADA.  We are required to pay $250,000 per quarter under the CRADA and the $20,000 annual minimum payments to the NIH under the NIH licensing agreement.  Accordingly, these $250,000 quarterly payments represented most of our research and development expenses during the three month periods ending September 30, 2013 and 2014.  However, in the three-months period ended September 30, 2014 we also incurred some patent prosecution costs and other research and development costs (primarily fees paid to Lonza Walkersville, Inc. ("Lonza") under the June 2014 statement of work).  Now that we have leased our own research and development facility and have hired a new Chief Scientific Officer and four new scientists, our research and development activities will significantly increase in the future as we attempt to accelerate the development of our technologies.  In addition, we recently issued a new statement of work to Lonza to commence setting up a centralized TIL manufacturing center for our planned multicenter, pivotal clinical trials.  The work to be performed by Lonza will also materially increase our future research and development costs.

188.    The 3Q 2014 10-Q also stated that "[i]nformation regarding additional risk factors appears under the 'Risk Factors' included in . . . our [2013 10-K]," such as risks related to the Company's securities, but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes fluctuations in the price of the Company's securities.

189.    Attached to the 3Q 2014 10-Q were SOX certifications signed by Defendants Singh and Handelman attesting to its accuracy.

### March 16, 2015 Form 10-K

190.    On March 16, 2015, the Company filed an annual report for the fiscal period ended December 31, 2014 on a Form 10-K with the SEC (the "2014 10-K"), which was signed by Defendants Hawkins, Handelman, McPeak, Venkatesan, Hillsberg, and Maynard.  In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.  Thus, the 2014 10-K provided a misleading portrayal of the Company's business, operations, and prospects when it provided the Company's operating results for the fiscal year 2014, stating, in relevant part:

Revenues

As a development stage company that is currently engaged in the development of therapeutics to fight cancer, we have not yet generated any revenues from our biopharmaceutical business or otherwise since our formation. We currently do not anticipate that we will generate any revenues during 2014 from the sale or licensing of any products.

Costs and expenses

*Operating Expenses*.

Operating expenses include compensation for our employees who are dedicated to research and development, general and administrative activities, legal fees, audit and tax fees, consultants and professional services, and general corporate expenses. Our operating expenses were $9,335,772 and $4,655,000 for the fiscal years ended December 31, 2014 ("fiscal 2014") and 2013 ("fiscal 2013"), respectively . . . . We raised $23.3 million in the Private Placement in November 2013, which funds we invested in 2014 in the expansion of our operations. Operating expenses also increased in fiscal 2014 because of a $1,046,000 increase in stock based compensation (stock based compensation was $3,796,000 and $2,750,000 in fiscal 2014 and 2013, respectively). Our operating expenses in fiscal 2014 also increased compared to fiscal 2013 due to increased legal fees related to patent and licensing issues and in connection with responding to the SEC's subpoena in the "*In the Matter of Certain Stock Promotions*" investigation being conducted by the SEC (see, "Item 3. Legal Proceedings", above). Since the Private Placement, we have engaged additional employees and consultants, which will also increase the amount of cash compensation we will pay in 2015 and thereafter.

*Cost of Lion Transaction*.

In July 2013, we entered into an Agreement and Plan of Merger (the "Lion Agreement") with Lion Biotechnologies, Inc., a privately held Delaware corporation. Under the Lion Agreement, Lion Biotechnologies, Inc.'s stockholders received, in exchange for all of their issued and outstanding shares of common stock, an aggregate of 1,340,000 shares of our common stock with a fair value of $6,700,000. Under the Lion Agreement, we also were obligated to issue an additional 1,350,000 shares of common stock upon the achievement of certain milestones related to our financial performance and position). These other milestones were achieved in the fourth quarter of fiscal 2013 and, as a result, we issued all 1,350,000 shares (having a fair value of $9,956,250) in fiscal 2013. The value of the shares issued under the Lion Agreement was recognized and recorded as an expense in 2013. The purpose of the Lion Agreement was to acquire access to technical and managerial resources to build our current and future products, which we believed would enhance or future operations and enable us to obtain additional funding. The technical resources that we acquired included access to next generation T-cell technologies (including term sheets for such technologies), access

to cancer vaccine technologies that Lion Biotechnologies, Inc. was evaluating at Harvard University, NIH, Baylor University and other institutions, and other proprietary technologies and ideas on novel T-cell manufacturing technologies that that company was designing.

*Research and Development.*

Research and development costs were $2,704,597 in fiscal 2014 compared to $1,329,367 for the year ended December 31, 2013. Research and development expenses in both fiscal 2014 and fiscal 2013 included $1,000,000 paid and accrued under the CRADA with the NIH and fees paid to the NIH under the NIH License Agreement . . . .   We intend to engage in significant research and development activities in the future, which activities are expected to substantially increase our annual research and development expenses.

191.   The 2014 10-K also noted risks related to the Company's securities, but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes fluctuations in the price of the Company's securities, stating, in relevant part:

**The market price of our stock may be adversely affected by market volatility.**

The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including:

- announcements of the results of clinical trials by us or our competitors;

- developments with respect to patents or proprietary rights;

- announcements of technological innovations by us or our competitors;

- announcements of new products or new contracts by us or our competitors;

- actual or anticipated variations in our operating results due to the level of development expenses and other factors;

- changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;

- conditions and trends in the pharmaceutical and other industries;

- general economic, political and market conditions and other factors; and

- the occurrence of any of the risks described in this Annual Report.

192.   Attached to the 2014 10-K were SOX certifications signed by Defendants Hawkins and Handelman attesting to its accuracy.

### April 30, 2015 Proxy Statement

193.    On April 30, 2015, the Company filed the 2015 Proxy Statement with the SEC, which failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.  The 2015 Proxy Statement was also false and misleading in stating that the Code of Ethics was adopted by the Board and that it applies to the Company's officers, directors and employees, in light of the violations of the Code of Ethics engaged in by the Individual Defendants, including through the false and misleading statements, insider trades, and the Stock Promotion Scheme discussed herein.

### May 11, 2015 Form 10-Q

194.    On May 11, 2015, the Company filed a quarterly report for the fiscal period ended March 31, 2015 on a Form 10-Q with the SEC (the "1Q 2015 10-Q"), which was signed by Defendants Hawkins and Handelman.  In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.  Thus, the 1Q 2015 10-Q provided a misleading portrayal of the Company's business, operations, and prospects when it provided the Company's operating results for the first fiscal quarter 2015, stating, in relevant part:

*Revenues*

As a development stage company that is currently engaged in the development of novel cancer immunotherapy products, we have not yet generated any revenues from our biopharmaceutical business or otherwise since our formation. We currently do not anticipate that we will generate any revenues during 2015 from the sale or licensing of any products. Our ability to generate revenues in the future will depend on our ability to complete the development of our product candidates and to obtain regulatory approval for them.

*Operating Expenses*

Operating expenses include compensation-related costs for our employees engaged to general and administrative activities (other than employees engaged in research and development), legal fees, audit and tax fees, consultants and professional

services, and general corporate expenses. Our operating expenses increased by 68% from $1,957,000 for the three months ended March 31, 2014 ("fiscal 2014 quarter") to $3,287,000 for the three months ended March 31, 2015 ("fiscal 2015 quarter"). Our operating expenses during the fiscal 2015 quarter increased by $1,330,000 compared with the fiscal 2014 quarter due to the increase in our overall business activities, including an increase in expense related to obtaining and maintaining our NASDAQ listing, compliance with SEC requirements, and increases in insurance and investor relations . . . .

*Research and Development*.

Research and development expenses consist of expenses incurred in performing research and development activities, including compensation and benefits for research and development employees and consultants, rent at our new research and development facility in Tampa, Florida, cost of laboratory supplies, manufacturing expenses, and fees paid to third parties, including the NCI and Lonza Walkersville, Inc., a third party contractor that will process and manufacture LN-144 for our clinical trials in patients. Research and development expenses also included amounts paid (i) the National Institutes of Health under terms of our license agreement, and (ii) NCI under the CRADA. Research and development costs increased by 563.7% from $303,000 in the fiscal 2014 quarter to $2,011,000 in the fiscal 2015 quarter mostly due to the establishment of our Tampa, Florida, research facility in the fourth quarter of 2014 . . . .  We anticipate that our research and development costs will continue to increase in the future as we increase our research and development activities and accelerate the development of our technologies and product candidates.

195.    The 1Q 2015 10-Q also stated that "[t]here have been no material changes from the risk factors previously disclosed in the [2014 10-K]," but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes fluctuations in the price of the Company's securities.

196.    Attached to the 1Q 2015 10-Q were SOX certifications signed by Defendants Hawkins and Handelman attesting to its accuracy.

**August 10, 2015 Press Release**

197.    On August 10, 2015, the Company issued a press release titled "Lion Biotechnologies Announces Second Quarter 2015 Financial Results."   In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.   Thus, the press release provided a misleading portrayal of the

Company's business, operations, and prospects when it provided the Company's operating results

for the second quarter and six months ended June 30, 2015, stating, in relevant part:

> For the second quarter and six months ended June 30, 2015, the Company reported operating expenses of $2.4 million and $4.9 million, respectively, compared to $1.6 million and $3.1 million respectively for the comparable 2014 periods. Research and development expenses totaled $4.1 million and $6.8 million, respectively, for the three and six months ended June 30, 2015, compared to $0.5 million and $1.2 million, respectively, for the same periods in 2014. During the six months ended June 30, 2015, the Company raised $63.8 net proceeds from the sale of its shares of common stock and received $7.9 million through the exercise of warrants. As a result, as of June 30, 2015, the Company held $112.3 million in cash and short-term investments.

### *August 10, 2015 Form 10-Q*

198.    On August 10, 2015, Lion Bio filed a quarterly report for the fiscal quarter ended

June 30, 2015 on a Form 10-Q with the SEC (the "2Q 2015 10-Q"), which was signed by

Defendants Hawkins and Henderson.  The 2Q 2015 10-Q reiterated substantially the same results

announced in the August 10, 2015 press release.  In it, the Individual Defendants failed to disclose:

(1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.

199.    The 2Q 2015 10-Q also stated that "[t]here have been no material changes from the

risk factors previously disclosed in the [2014 10-K]," but misleadingly failed to disclose the Stock

Promotion Scheme as a factor that causes fluctuations in the price of the Company's securities.

200.    Attached to the 2Q 2015 10-Q were SOX certifications signed by Defendants

Hawkins and Henderson attesting to its accuracy.

### *November 5, 2015 Press Release*

201.    On November 5, 2015, the Company issued a press release titled "Lion

Biotechnologies Announces Third Quarter 2015 Financial Results."   In it, the Individual

Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed

to maintain internal controls.   Thus, the press release provided a misleading portrayal of the

Company's business, operations, and prospects when it provided the Company's operating results

for the third quarter and nine months ended September 30, 2015, stating, in relevant part:

> For the third quarter and nine months ended September 30, 2015, the Company reported operating expenses of $2.9 million and $7.5 million, respectively, compared to $2.4 million and $6.2 million, respectively, for the comparable 2014 periods. Research and development expenses totaled $5.0 million and $12.1 million, respectively, for the three and nine months ended September 30, 2015, compared to $0.4 million and $1.0 million, respectively, for the same periods in 2014. During the nine months ended September 30, 2015, the Company raised $68.3 net proceeds from the sale of its shares of common stock and received $9.6 million through the exercise of warrants. As a result, as of September 30, 2015, the Company held $110.1 million in cash and short-term investments.

### *November 6, 2015 Form 10-Q*

202.    On November 6, 2015, the Company filed a quarterly report for the fiscal quarter

ended September 30, 2015 on a Form 10-Q with the SEC (the "3Q 2015 10-Q"), which was signed

by Defendants Hawkins and Henderson.   The 3Q 2015 10-Q reiterated substantially the same

results announced in the November 5, 2015 press release.   In it, the Individual Defendants failed

to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal

controls.

203.    The 3Q 2015 10-Q also stated that "[t]here have been no material changes from the

risk factors previously disclosed in the [2014 10-K]," but misleadingly failed to disclose the Stock

Promotion Scheme as a factor that causes fluctuations in the price of the Company's securities.

204.    Attached to the 3Q 2015 10-Q were SOX certifications signed by Defendants

Hawkins and Henderson attesting to its accuracy.

### *March 10, 2016 Press Release*

205.    On March 10, 2016, the Company issued a press release titled "Lion

Biotechnologies Announces 2015 Fourth-Quarter and Year-End Financial Results."   In it, the

Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the

Company failed to maintain internal controls.  Thus, the press release provided a misleading portrayal of the Company's business, operations, and prospects when it provided the Company's operating results for the fourth quarter and year ended December 31, 2015, stating, in relevant part:

> For the fourth quarter and year ended December 31, 2015, the company reported research and development expenses of $5.1 million and $15.5 million, respectively, compared to $2.7 million and $3.8 million, respectively, for the prior year ended December 31, 2014. General and administrative expenses totaled $3.9 million and $12.4 million, respectively, for the three months and year ended December 31, 2015, compared to $2.0 million and $8.2 million, respectively, for the same periods in 2014. During the year ended December 31, 2015, the company raised $68.3 in net proceeds from the sale of its shares of common stock and received $9.7 million through the exercise of warrants. As of December 31, 2015, the company held $103.7 million in cash and short-term investments and anticipates investing between $30 million and $35 million in its research, development and operations during 2016.

### March 11, 2016 Form 10-K

206.    On March 11, 2016, the Company filed an annual report for the fiscal year ended December 31, 2015 on a Form 10-K with the SEC (the "2015 10-K"), which was signed by Defendants Hawkins, Henderson, McPeak, Venkatesan, Hillsberg, and Maynard.  The 2015 10-K reiterated substantially the same results announced in the March 10, 2016 press release.  In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.

207.    The 2015 10-K also noted risks related to the Company's securities, but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes fluctuations in the price of the Company's securities, stating, in relevant part:

> **The market price of our stock may be adversely affected by market volatility.**
>
> The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including but not limited to:
>
> - announcements of the results of clinical trials by us or our competitors;
> - developments with respect to patents or proprietary rights;
> - announcements of technological innovations by us or our competitors;

- announcements of new products or new contracts by us or our competitors;
- actual or anticipated variations in our operating results due to the level of development expenses and other factors;
- changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;
- conditions and trends in the pharmaceutical, biotechnology and other industries;
- receipt, or lack of receipt, of funding in support of conducing [sic] our business;
- regulatory developments within, and outside of, the United States;
- litigation or arbitration;
- general volatility in the financial markets;
- general economic, political and market conditions and other factors; and
- the occurrence of any of the risks described in this Annual Report.

208.     Attached to the 2015 10-K were SOX certifications signed by Defendants Hawkins

and Henderson attesting to its accuracy.

### April 28, 2016 Proxy Statement

209.     On April 28, 2016, the Company filed a Schedule 14A with the SEC (the "Initial

2016 Proxy Statement"), which failed to disclose: (1) the Stock Promotion Scheme; and (2) that

the Company failed to maintain internal controls.  The Initial 2016 Proxy Statement was also false

and misleading in stating that the Code of Ethics was adopted by the Board and that it applies to

the Company's officers, directors and employees, in light of the violations of the Code of Ethics

engaged in by the Individual Defendants, including through the false and misleading statements,

insider trades, and the Stock Promotion Scheme discussed herein.

### May 9, 2016 Press Release

210.     On May 9, 2016, the Company issued a press release titled "Lion Biotechnologies

Announces First Quarter 2016 Financial Results."   In it, the Individual Defendants failed to

disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal

controls.  Thus, the press release provided a misleading portrayal of the Company's business,

operations, and prospects when it provided the Company's operating results for the fiscal quarter

ended March 31, 2016, stating, in relevant part:

For the first quarter ended March 31, 2016, Lion reported research and development expenses of $4.2 million, compared to $2.4 million for the same period in 2015. The increase in research and development spending in 2016 is due, in part, to the initiation of a Phase 2 study for LN-144 and an increase in the research activities at the company's Tampa, Florida research and development facilities. General and administrative expenses remained substantially unchanged at $2.8 million for the quarter ended March 31, 2016, compared to $2.9 million for the same period in 2015.

During the first quarter of 2016, the Company consumed a net of $4.5 million of its cash on general and administrative and research and development activities. As a result, as of March 31, 2016, the Company held $99.2 million in cash and short-term investments, compared to $103.7 million as of December 31, 2015.

### May 9, 2016 Form 10-Q

211.    On May 9, 2016, the Company filed a quarterly report for the fiscal quarter ended March 31, 2016 on a Form 10-Q with the SEC (the "1Q 2016 10-Q"), which was signed by Defendants Hawkins and Henderson.  The 1Q 2016 10-Q reiterated substantially the same results announced in the May 9, 2016 press release.  In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.

212.    The 1Q 2016 10-Q also stated that "[t]here have been no material changes from the risk factors previously disclosed in the [2015 10-K]," but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes fluctuations in the price of the Company's securities.

213.    Attached to the 1Q 2016 10-Q were SOX certifications signed by Defendants Hawkins and Henderson attesting to its accuracy.

### July 7, 2016 Proxy Statement

214.    On July 7, 2016, the Company filed a Schedule 14A with the SEC after rescheduling their 2016 Annual Meeting of Stockholders (the "Second 2016 Proxy Statement"), which failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.  The Second 2016 Proxy Statement was also false and misleading in stating that the Code of Ethics was adopted by the Board and that it applies to the Company's

officers, directors and employees, in light of the violations of the Code of Ethics engaged in by the Individual Defendants, including through the false and misleading statements, insider trades, and the Stock Promotion Scheme discussed herein.

### August 8, 2016 Press Release

215.    On August 8, 2016, the Company issued a press release titled "Lion Biotechnologies Announces Second Quarter 2016 Financial Results." In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls. Thus, the press release provided a misleading portrayal of the Company's business, operations, and prospects when it provided the Company's operating results for the fiscal quarter ended June 30, 2016, stating, in relevant part:

> For the second quarter ended June 30, 2016, Lion reported research and development expenses of $4.5 million, compared to $4.1 million for the same period in 2015. Year-to-date June 30, 2016 research and development expenses were $8.7 million compared to $6.8 million for the first six months of 2015. The increase in research and development spending in 2016 is due, in part, to the ongoing Phase 2 study for LN-144 and an increase in hiring at the Company's Tampa, Florida research and development facility.

> General and administrative expenses increased to $7.3 million for the quarter ended June 30, 2016, compared to $2.4 million for the same period in 2015. Year-to-date June 30, 2016 general and administrative expenses were $10.1 million compared to $4.9 million for the same period in 2015. The increase in general and administrative expenses for 2016 is primarily due to the hiring of new employees along with severance and $3.5 million in non-cash stock compensation charges associated with the Company's former Chief Executive Officer.

> Excluding non-cash stock compensation expense, the Company incurred approximately $11.6 million in costs on general and administrative and research and development activities for the six months ended June 30, 2016. After these expenditures and the net proceeds received from the $100 million private placement, the Company held $191.6 million in cash and short-term investments as of June 30, 2016, compared to $103.7 million as of December 31, 2015.

### August 9, 2016 Form 10-Q

216.    On August 9, 2016, the Company filed a quarterly report for the fiscal quarter ended

June 30, 2016 on a Form 10-Q with the SEC (the "2Q 2016 10-Q"), which was signed by Defendants Fardis and Henderson.  The 2Q 2016 10-Q reiterated substantially the same results announced in the August 8, 2016 press release.  In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.

217.    The 2Q 2016 10-Q also stated that, except for issues related to sales of common stock by stockholders by means of an ineffective registration statement and prospectus due to the effectiveness of a new registration statement covering the sale of such shares, there "have been no material changes from the risk factors previously disclosed in the [2015 10-K]," but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes fluctuations in the price of the Company's securities.

218.    Attached to the 2Q 2016 10-Q were SOX certifications signed by Defendants Fardis and Henderson attesting to its accuracy.

### November 4, 2016 Press Release

219.    On November 4, 2016, the Company issued a press release titled "Lion Biotechnologies Reports Third Quarter 2016 Financial Results and Provides Corporate Update." In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.  Thus, the press release provided a misleading portrayal of the Company's business, operations, and prospects when it provided the Company's operating results for the fiscal quarter ended September 30, 2016, stating, in relevant part:

### Third Quarter and Year-to-Date 2016 Financial Results

As of September 30, 2016 the Company held $179.3 million in cash and cash equivalents and short-term investments, compared to $103.7 million as of December 31, 2015.

### GAAP and Non-GAAP net loss attributable to common stockholders

GAAP net loss attributable to common stockholders, which included a one-time deemed dividend charge of $49.5 million incurred as a result of the conversion feature of the Series B convertible preferred stock, for the quarter ended September 30, 2016 was $68.2 million, or ($1.15) per share, compared to GAAP net loss attributable to common stockholders of $7.6 million or ($0.16) per share for the quarter ended September 30, 2015. The deemed dividend did not have any monetary impact for the Company.

Non-GAAP net loss attributable to common stockholders, which excludes amounts related to stock-based compensation and the non-cash deemed dividend, for the quarter ended September 30, 2016 was $10.1 million, or ($0.17) per share, compared to non-GAAP net loss attributable to common stockholders of $5.2 million, or ($0.11) per share for the quarter ended September 30, 2015. The non-GAAP net loss attributable to common stockholders for the three months ended September 30, 2016 excludes $8.6 million of non-cash stock-based compensation and a non-cash deemed dividend of $49.5 million. The stock compensation increase year-over-year of $6.3 million is primarily driven by the departure of the Company's former CFO. The deemed dividend will only impact the current quarter's financial statements . . . .

### GAAP and Non-GAAP expenses

GAAP research and development (R&D) expenses of $8.5 million for the quarter ended September 30, 2016 increased by $3.5 million compared to the quarter ended September 30, 2015. The increase in R&D expense is due to increased spending on clinical activities for LN-144. In addition, R&D-associated stock option expenses were $0.6 million for the three months ended September 30, 2016 and $1.8 million for the nine months ended September 30, 2016. Non-GAAP R&D expenses of $7.8 million for the quarter ended September 30, 2016 increased by $3.7 million, compared to $4.1 million for the quarter ended September 30, 2015.

GAAP general and administrative (G&A) expenses of $10.5 million increased by $7.8 million compared to the quarter ended September 30, 2015. Non-GAAP G&A expenses of $2.5 million for the quarter ended September 30, 2016 increased by $1.3 million, compared to $1.2 million for the quarter ended September 30, 2015 ….

### 2016 Cash Expectations

Lion anticipates the ending cash, cash equivalents and short-term investments as of December 31, 2016, to be in excess of $164.0 million.

### November 4, 2016 Form 10-Q

220.    On November 4, 2016, the Company filed a quarterly report for the fiscal quarter

ended September 30, 2016 on a Form 10-Q with the SEC (the "3Q 2016 10-Q"), which was signed by Defendant Fardis.  The 3Q 2016 10-Q reiterated substantially the same results announced in the November 4, 2016 press release.  In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.

221.    The 3Q 2016 10-Q also stated that, except for issues related to sales of common stock by stockholders by means of an ineffective registration statement and prospectus due to the effectiveness of a new registration statement covering the sale of such shares, "have been no material changes from the risk factors previously disclosed in the [2015 10-K]," but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes fluctuations in the price of the Company's securities.

222.    Attached to the 2Q 2016 10-Q were SOX certifications signed by Defendant Fardis attesting to its accuracy.

### March 7, 2017 Press Release

223.    On March 7, 2017, the Company issued a press release titled "Lion Biotechnologies Reports Fourth Quarter and Full-Year 2016 Financial Results and Provides Corporate Update."  In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.  Thus, the press release provided a misleading portrayal of the Company's business, operations, and prospects when it provided the Company's operating results for the fiscal quarter and year ended December 31, 2016, stating, in relevant part:

### Fourth Quarter and Full-Year 2016 Financial Results

As of December 31, 2016 the Company held $166.5 million in cash and cash equivalents and short-term investments, compared to $103.7 million as of December 31, 2015.

### GAAP and Non-GAAP net loss attributable to common stockholders

74

GAAP net loss attributable to common stockholders for the quarter ended December 31, 2016 was $15.7 million, or ($0.25) per share, compared to GAAP net loss attributable to common stockholders of $8.4 million or ($0.17) per share for the quarter ended December 31, 2015.

Non-GAAP net loss attributable to common stockholders, which excludes amounts related to stock-based compensation, for the quarter ended December 31, 2016 was $12.6 million, or ($0.20) per share, compared to non-GAAP net loss attributable to common stockholders of $5.6 million, or ($0.11) per share for the quarter ended December 31, 2015. The non-GAAP net loss attributable to common stockholders for the quarter ended December 31, 2016 excludes $3.1 million of non-cash stock-based compensation.

GAAP net loss attributable to common stockholders for the year ended December 31, 2016, which included a one-time deemed dividend related to a charge of $49.5 million incurred as a result of the conversion feature of the recently issued Series B convertible preferred stock was $102.3 million, or ($1.85) per share, compared to GAAP net loss attributable to common stockholders of $27.7 million or ($0.62) per share for the year ended December 31, 2015. Non-GAAP net loss, which excludes amounts related to stock-based compensation and the $49.5 million non-cash deemed dividend for the year ended December 31, 2016 was $34.0 million, or ($0.62) per share, compared to non-GAAP net loss of $19.1 million or ($0.43) per share for the year ended December 31, 2015 . . . .

***GAAP and Non-GAAP expenses***

GAAP research and development (R&D) expenses were $10.9 million for the quarter ended December 31, 2016, an increase of $6.8 million compared to the quarter ended December 31, 2015 . . . .

GAAP general and administrative (G&A) expenses were $5.0 million, an increase of $0.6 million compared to the quarter ended December 31, 2015. Non-GAAP G&A expenses, which excludes amounts related to stock-based compensation, of $3.3 million for the quarter ended December 31, 2016 increased by $1.4 million, compared to $1.9 million for the quarter ended December 31, 2015.

***March 9, 2017 Form 10-K***

224.    On March 9, 2017, the Company filed an annual report for the fiscal quarter and year ended December 31, 2016 on a Form 10-Q with the SEC (the "2016 10-K"), which was signed by Defendants Fardis, McPeak, Venkatesan, Hillsberg, Maynard, Dukes, and Rothbaum.  The 2016 10-K reiterated substantially the same results announced in the March 7, 2017 press release. In it, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that

the Company failed to maintain internal controls.

225.     The 2016 10-K also noted risks related to the Company's securities, but misleadingly failed to disclose the Stock Promotion Scheme as a factor that causes fluctuations in the price of the Company's securities, stating, in relevant part:

> **Our stock price may be volatile, and our stockholders' investment in our stock could decline in value.**
>
> The market price of our common stock is likely to be volatile and could fluctuate widely in response to many factors, including but not limited to:
>
> - announcements of the results of clinical trials by us or our competitors;
> - developments with respect to patents or proprietary rights;
> - announcements of technological innovations by us or our competitors;
> - announcements of new products or new contracts by us or our competitors;
> - actual or anticipated variations in our operating results due to the level of development expenses and other factors;
> - changes in financial estimates by securities analysts and whether our earnings meet or exceed such estimates;
> - conditions and trends in the pharmaceutical, biotechnology and other industries;
> - receipt, or lack of receipt, of funding in support of conducing [sic] our business;
> - regulatory developments within, and outside of, the United States;
> - litigation or arbitration;
> - general volatility in the financial markets;
> - general economic, political and market conditions and other factors; and
> - the occurrence of any of the risks described in this Annual Report.

226.     Attached to the 2016 10-K were SOX certifications signed by Defendant Fardis attesting to its accuracy.

### **The Truth Emerges**

### *The Order*

227.     On April 10, 2017, the SEC issued the Order.  The Order revealed the Company's engagement in the wrongdoing alleged herein. The Order summarized the SEC's findings, stating, in relevant part:

### **SUMMARY**

From September 2013 to March 2014, Lion, through its former Chief Executive Officer, Manish Singh, engaged in a scheme to mislead investors by commissioning over 10 internet publications and 20 widely distributed emails promoting Lion to potential investors that purported to be independent from the company when, in fact, they were paid promotions. Singh engaged Lidingo Holdings, a stock promotion firm, to pay writers to publish articles about Lion on investment websites as well as to coordinate the distribution of articles to thousands of electronic mailboxes. Singh actively participated in Lidingo's promotional work for Lion and understood that Lidingo was using writers who would not disclose that Lion was indirectly compensating them for their publications. These omissions, and in some cases, affirmative misstatements by writers that they were not receiving compensation for their articles, created the misleading impression that the views contained in the publications were objective and independently formed. In addition, Lidingo itself published one article that Singh commissioned after Lion filed a registration statement, but before that registration statement became effective. This article did not comply with the federal securities laws relating to prospectuses. As a consequence of this conduct, Lion violated and caused violations of the anti-fraud provisions and caused violations of the anti-touting provisions of the federal securities laws and engaged in improper "gun-jumping."

228.    The Order also set forth what the SEC determined to be the relevant facts:

## FACTS

### A.    Lidingo's Promotional Work for Lion

4.      In September 2013, Lion's then-CEO Singh hired Lidingo to promote Lion stock.  Their contract required Lion to pay $20,000 per month and issue 50,000 shares of Lion stock to Lidingo. Lion paid Lidingo more than $230,000 in 2013 and 2014, before canceling the agreement in April 2014.

5.      Lidingo, in turn, paid writers to publish articles describing Lion securities on investment websites SeekingAlpha.com and WallStCheatSheet.com. In addition, Lidingo paid writers to ghost-write articles about Lion that Lidingo then published on Seeking Alpha's website under Lidingo-selected pseudonyms. None of the over 10 articles disclosed the writers' or Lidingo's compensation from Lion or otherwise disclosed that the publications were part of a paid promotion. Moreover, more than 10 of the articles published on Seeking Alpha's website affirmatively misrepresented that the author had not been compensated.

6.      For example, on October 10, 2013, Lion paid Lidingo $20,000. Eight days later, Lidingo, using the pseudonym "The Swiss Trader," published a ghost-written article discussing Lion securities on Seeking Alpha's website entitled "5 Companies Race to Develop the Next Great Melanoma Product." In the article, Lidingo affirmatively misstated that it was not receiving compensation for the article. Similarly, on December 3, 2013, Lion paid Lidingo $20,000. Lidingo

subsequently paid a writer $600 to publish an article about Lion securities six days later on Seeking Alpha's website entitled "4 Companies Developing Blockbuster Immunotherapies to Fight Cancer." Despite this payment, the writer affirmatively misstated that he was not receiving compensation for the article.

7.      Singh, acting as Lion's CEO, contributed to certain of the articles Lidingo or its writers published and sometimes controlled the timing of their publication. For example, on September 13, 2013, Singh sent Bjorlin an email attaching a proposed article discussing Lion and directed that Lidingo have the article published by a specific Lidingo writer or under the Lidingo pseudonym "The Swiss Trader." Two weeks later, Lidingo published a nearly verbatim version of Singh's attached article, called "3 Companies Developing the Future of Cancer Therapy." Lidingo published this article on Seeking Alpha's website using the pseudonym "The Swiss Trader" and falsely stated that it had not received compensation for the article. In another example, on December 31, 2013, Singh responded to a draft article about Lion, "This is okay to publish. I think I need to talk to [the writer] to explain how these technologies really work." In an email later that day, he instructed Bjorlin to have the writer publish the article on the following Thursday. As Singh was acting in his capacity as Lion's CEO, his conduct and state of mind are imputed to Lion.

229.   The Order continued:

8.      Singh, acting as Lion's CEO, knew or was reckless in not knowing that Lidingo publications about the company would either not disclose compensation or would affirmatively misrepresent that the author had not been compensated.

9.      The omissions and misrepresentations about Lion's payments for the promotional articles describing its securities were material because they suggested that the views contained in the publications were objective and independently formed.

10.     The Lion articles published on Seeking Alpha's and Wall St. Cheat Sheet's websites described Lion securities and certain of the articles were intended to solicit offers to buy the company's securities. For example, Seeking Alpha operated a widely-read website that held itself out as a "platform for investment research, with broad coverage of stocks, asset classes, ETFs and investment strategy" where "articles frequently move stocks, due to a large and influential readership which includes money managers, business leaders, journalists and bloggers."

11.     In addition, between September 2013 and March 2014, Lidingo hired a vendor to coordinate the distribution of 390,000 emails describing Lion's stock to potential investors in 20 separate mailings. Lidingo, which provided the email content to the vendor, did not disclose in the emails that it had been

compensated by Lion or the amount of the compensation. Singh understood that Lidingo sent out mass emails to potential investors on behalf of stock promotion clients, such as Lion. In addition, he approved the expense of having Lidingo work with a vendor to send Lion-related mass emails.

230. With regard to the Company's unlawful "gun jumping," the Order stated:

**B.     Lion Engaged in Unlawful "Gun Jumping"**

12.     As set forth above, Singh, acting as Lion's CEO, hired and paid Lidingo to generate articles about Lion securities. One such article was published on Seeking Alpha's website between December 4, 2013, the date that Lion filed a Form S-1 registration statement, and January 30, 2014, the date when that registration statement, as subsequently amended, was declared effective – a period referred to as the "waiting period." The article was a prospectus because it was a written offer to sell Lion securities in a public offering, but it did not meet the requirements of Securities Act Section 10.

231. The Order outlined the Company's specific violations as follows:

## VIOLATIONS

13.     As a result of the conduct described above, Lion violated Securities Act Sections 17(a)(1) and (3) and Exchange Act Section 10(b) and Rules 10b-5(a) and (c) thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities.

14.     As a result of the conduct described above, Lion caused Lidingo's and certain writers' violations of Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities.

15.     As a result of the conduct described above, Lion caused Lidingo's and certain writers' violations of Securities Act Section 17(b), which prohibits any person from publishing, giving publicity to, or circulating any communication that describes a security in exchange for direct or indirect consideration from an issuer, underwriter, or dealer without fully disclosing the past or prospective consideration and the amount.

16.     As a result of the conduct described above, Lion violated Securities Act Section 5(b)(1), which prohibits any person from directly or indirectly using interstate means to carry or transmit a prospectus relating to any security with respect to which a registration statement has been filed unless such prospectus complies with Securities Act Section 10. The article that Lion caused to be published after the filing of its registration statement but before its registration

statement was deemed effective was a prospectus that failed to meet the requirements of Securities Act Section 10.

232.    The Order additionally imposed sanctions against the Company, stating, in relevant part:

> In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent Lion's Offer.
>
> Accordingly, pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, it is hereby ORDERED that:
>
> A.    Respondent Lion cease and desist from committing or causing any violations and any future violations of Sections 5(b), 17(a), and 17(b) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.
>
> B.    Respondent Lion shall, within 14 days of the entry of this Order, pay a civil money penalty in the amount of $100,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

233.    On April 10, 2017, the price per share of Company stock at the close of trading was $6.35.  On April 11, 2017, the day after the Order was issued, the price per share of Company stock at closing fell to $6.20.

### *April 11, 2017 Form 8-K*

234.    On April 11, 2017, the Company filed a current report on a Form 8-K with the SEC, commenting on the Company's settlement with the SEC.  The Form 8-K stated, in relevant part:

> Lion Biotechnologies, Inc. ("we" or "us") previously disclosed that the Securities and Exchange Commission ("SEC") was conducting an investigation (initially designated as "*In the Matter of Galena Biopharma, Inc.*" File No. HO 12346 and now known as "*In the Matter of Certain Stock Promotions*") and that we were a part of that investigation. The SEC's investigation, in part, involved the conduct of our former Chief Executive Officer, Manish Singh, during the period between September 2013 and April 2014, and the failure by authors of certain articles about this company to disclose that they were compensated by one of our former investor relations firms. We also previously disclosed that we submitted an offer of settlement to the SEC, as well as the terms of the proposed settlement.

On April 10, 2017, the SEC announced settlements with us and with other public companies and unrelated parties in the *In the Matter of Certain Stock Promotion* investigation. The announcement can be viewed at the SEC's website at http://www.sec.gov. Our settlement with the SEC is consistent with our previously disclosed settlement offer (including in our Form 10-K that we filed with the SEC on March 9, 2017), and consists of the following: (i) We agreed, without admitting or denying the findings by the SEC, to the entry of an administrative order that requires us to cease and desist from committing or causing any violations and any future violations of Sections 5(b), 17(a), and 17(b) of the Securities Act of 1933, and of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and (ii) we agreed to pay $100,000 as a civil money penalty. We also agreed to adopt certain internal controls with respect to our investor relations/public relations activities.

235.    On this news, the price per share of Company stock fell further to close at $6.15 on April 12, 2017.

## Summary of Individual Defendants' Misconduct

236.    In breach of their fiduciary duties, the Individual Defendants engaged in and/or caused the Company to engage in the Stock Promotion Scheme, and Defendant Bjorlin aided and abetted such breach.

237.    In further breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

238.    The Individual Defendants moreover breached their fiduciary duties by making and/or causing the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

239.    Moreover, while the price of the Company's stock was artificially inflated due to the Stock Promotion Scheme and the false and misleading statements described herein, one of the Individual Defendants made lucrative insider sales on material inside information.

## DAMAGES TO IOVANCE

240.   As a direct and proximate result of the Individual Defendants' and Defendant Bjorlin's conduct, Iovance has lost and will lose and expend many millions of dollars.

241.   Such expenditures include, but are not limited to, legal fees associated with the SEC investigation and with the Securities Class Action filed against the Company and Defendants Singh and Handelman, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

242.   Such costs include at least $230,000 paid to the stock promoters and the $100,000 paid to the SEC as a civil money penalty as a result of the Order.

243.   Such costs also include, but are not limited to, unjust compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

244.   As a direct and proximate result of the Individual Defendants' and Defendant Bjorlin's conduct, Iovance has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

245.   Plaintiff brings this action derivatively and for the benefit of Iovance to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Iovance and unjust enrichment, as well as Defendant Bjorlin's aiding and abetting thereof.

246.   Iovance is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

247.   Plaintiff is, and at all relevant times has been, a Iovance shareholder.  Plaintiff will

adequately and fairly represent the interests of Iovance in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

248.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

249.   A pre-suit demand on the Board of Iovance is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following seven Individual Defendants: Defendants Dukes, Fardis, Hillsberg, Maynard, McPeak, Rothbaum, and Venkatesan (collectively, the "Directors").  Plaintiff only needs to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

250.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause and/or allow the Company to engage in the Stock Promotion Scheme and/or to make false and misleading statements and omissions of material fact, while one of them engaged in insider sales based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

251.   In complete abdication of their fiduciary duties, the Directors knowingly or recklessly participated in the Stock Promotion Scheme and/or the scheme to make and/or cause the Company to make the materially false and misleading statements alleged herein.   The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants and Defendant Bjorlin, one of the Individual Defendants, who is a Director, sold over

$1.9 million worth of Company stock at artificially inflated prices based on inside material information.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

252.    Additional reasons that demand on Defendant Fardis is futile follow.  Defendant Fardis has served as the Company's CEO and as a Company director since June 2016.  She is, as the Company admits, a non-independent director.  Defendant Fardis was ultimately responsible for all of the false and misleading statements and omissions that were made since becoming CEO, including those contained in the Company's press releases and SEC filings referenced herein, almost all of which she personally made statements in or signed beginning August 9, 2016.  She received lavish compensation, including $6,561,347 in 2016.  Defendant Fardis' large Company stock holding, worth over $2.4 million on April 5, 2017, reveals her interest in keeping the Company's stock price as high as possible.  As the Company's CEO and as a Company director, Defendant Fardis conducted little, if any, oversight of the Company's engagement in the Stock Promotion Scheme and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded her duties to monitor engagement in the scheme, and consciously disregarded her duties to protect corporate assets.  Thus, for these reasons, too, Defendant Fardis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

253.    Additional reasons that demand on Defendant Hillsberg is futile follow.  Defendant Hillsberg has served as a Company director since September 2013.  Defendant Hillsberg received lavish compensation, including $362,770 in 2015.  His insider sales before the fraud was exposed, which yielded $1,967,063, demonstrate his motive in facilitating and participating in the fraud.

His large Company stock holding, worth over $1.7 million on April 5, 2017, reveals his interest in keeping the Company's stock price as high as possible.   As a long-time director, Defendant Hillsberg conducted little, if any, oversight of the Company's engagement in the Stock Promotion Scheme and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.   Defendant Hillsberg is an attorney at a law firm that renders legal services to the Company and that receives compensation for such services.   He may fear retaliation against his law firm or himself if he grants a demand.   Moreover, he signed, and thus personally made, the false and misleading statements in the 2013-2016 10-Ks that are referenced herein.   For these reasons, too, Defendant Hillsberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

254.    Additional reasons that demand on Defendant Rothbaum is futile follow. Defendant Rothbaum has served as a Company director since June 2016.   He also serves as a member of the Compensation Committee.   Moreover, Defendant Rothbaum was appointed to his directorship as a result of the Quogue Agreement and serves as President of Quogue Capital.   He is thus beholden to Quogue Capital, a shareholder of the Company.   His large Company stock holding, worth over $26.5 million on April 5, 2017, reveals his interest in keeping the Company's stock price as high as possible.   As a director, Defendant Rothbaum conducted little, if any, oversight of the Company's engagement in the Stock Promotion Scheme and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.   Moreover, he signed, and thus personally made,

the false and misleading statements in the 2016 10-K that is referenced herein.  For these reasons, too, Defendant Rothbaum breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

255.   Additional reasons that demand on Defendant Dukes is futile follow.  Defendant Dukes has served as a Company director since August 2016.  He also serves as the Chairman of the Board and as a member of the Audit Committee and as a member of the Nominating and Governance Committee.  Defendant Dukes received lavish compensation, including $655,219 in 2016.  Moreover, Defendant Dukes was appointed to his directorship as a result of the Quogue Agreement, and is thus beholden to Quogue Capital, a shareholder of the Company.  His large Company stock holding, worth $362,250 on April 5, 2017, reveals his interest in keeping the Company's stock price as high as possible.  As a director, Defendant Dukes conducted little, if any, oversight of the Company's engagement in the Stock Promotion Scheme and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that is referenced herein.  For these reasons, too, Defendant Dukes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

256.   Additional reasons that demand on Defendant Maynard is futile follow.  Defendant Maynard has served as a Company director since February 2015.  He also serves as the Chairman of the Audit Committee.  Defendant Maynard received lavish compensation, including $367,396 in 2016.  His large Company stock holding, worth over $767,625 on April 5, 2017, reveals his interest in keeping the Company's stock price as high as possible.  As a director, Defendant

Maynard conducted little, if any, oversight of the Company's engagement in the Stock Promotion Scheme and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2014-2016 10-Ks that are referenced herein.  For these reasons, too, Defendant Maynard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

257.    Additional reasons that demand on Defendant McPeak is futile follow.  Defendant McPeak has served as a Company director since July 2011.  He also serves as the Chairman of the Nominating and Governance Committee, as a member of the Audit Committee, and as a member of the Compensation Committee.  Defendant McPeak received lavish compensation, including $375,216 in 2016.  His large Company stock holding, worth over $4.1 million on April 5, 2017, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director, Defendant McPeak conducted little, if any, oversight of the Company's engagement in the Stock Promotion Scheme and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2013-2016 10-Ks that are referenced herein.  For these reasons, too, Defendant McPeak breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

258.    Additional reasons that demand on Defendant Venkatesan is futile follow.

Defendant Venkatesan has served as a Company director since September 2013.  He also serves as the Chairman of the Compensation Committee and as a member of the Audit Committee and as a member of the Nominating and Governance Committee.  Defendant Venkatesan received lavish compensation, including $374,896 in 2016.  His large Company stock holding, worth over $20.5 million on April 5, 2017, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director, Defendant Venkatesan conducted little, if any, oversight of the Company's engagement in the Stock Promotion Scheme and the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2013-2016 10-Ks that are referenced herein.  For these reasons, too, Defendant Venkatesan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

259.    Additional reasons that demand on the Board is futile follow.

260.    The Directors, as members of the Board, were and are subject to the Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics requires the Directors to also adhere to Iovance's standards of business conduct.  The Directors did not comply with the requirements of the Code of Ethics. The Directors violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to engage in the stock promotion scheme and make the materially false and misleading statements alleged herein.  Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

261.    Defendants Rothbaum and Dukes were appointed to their directorships as a result of the Quogue Agreement.   As a result, they, particularly Defendant Rothbaum who serves as Quogue Capital's President, are beholden to Quogue Capital, and are thus not independent. Therefore, demand as to Defendants Rothbaum and Dukes is futile.

262.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.   These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.   Thus, any demand on the Directors would be futile.

263.    Iovance has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Iovance any part of the damages Iovance suffered, and will continue to suffer, thereby.   Thus, any demand on the Directors would be futile.

264.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.   Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).   As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.   Accordingly, demand is excused as being futile.

265.    The acts complained of herein constitute violations of fiduciary duties owed by

Iovance's officers and directors, and these acts are incapable of ratification.

266.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Iovance.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Iovance, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

267.    If there is no directors' and officers' liability insurance, then the Directors will not cause Iovance to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

268.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for
### Violations of Section 14(a) of the Securities Exchange Act of 1934

269.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

270.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

271.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

272.     Under the direction and watch of the Directors, the 2014, 2015, Initial 2016, and Second 2016 Proxy Statements failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.

273.     The 2014, 2015, Initial 2016, and Second 2016 Proxy Statements were also false and misleading in stating that the Code of Ethics was adopted by the Board and that it applies to the Company's officers, directors and employees, in light of the violations of the Code of Ethics engaged in by the Individual Defendants, including through the false and misleading statements, insider trades, and the Stock Promotion Scheme discussed herein.

274.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2014, 2015, Initial 2016, and Second 2016 Proxy Statements were materially false and

misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2014, 2015, Initial 2016, and Second 2016 Proxy Statements, including but not limited to, election of directors, approval of executive compensation, and ratification of the appointment of an independent auditor.

275.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2014, 2015, Initial 2016, and Second 2016 Proxy Statements.

276.    Plaintiff, on behalf of Iovance, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

277.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

278.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Iovance's business and affairs.

279.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

280.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Iovance.

281.    In breach of their fiduciary duties owed to Iovance and its shareholders, the Individual Defendants engaged in and/or caused the Company to engage in the Stock Promotion Scheme.

282.   The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

283.   In further breach of their fiduciary duties owed to Iovance, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements of material fact. Specifically, the Individual Defendants failed to disclose: (1) the Stock Promotion Scheme; and (2) that the Company failed to maintain internal controls.

284.   The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

285.   Additionally, one Individual Defendant engaged in lucrative insider sales while the price of the Company common stock was artificially inflated due to the Stock Promotion Scheme and the false and misleading statements of material fact described herein.

286.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Iovance's securities and disguising insider sales.

287.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.   The Individual Defendants had actual knowledge that the

Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Iovance's securities and engaging in insider sales.

288.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

289.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Iovance has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

290.    Plaintiff on behalf of Iovance has no adequate remedy at law.

<u>**THIRD CLAIM**</u>

**Against Individual Defendants for Unjust Enrichment**

291.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

292.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Iovance.

293.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Iovance that was tied to the performance or artificially inflated valuation of Iovance, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

294.     Plaintiff, as a shareholder and a representative of Iovance, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

295.     Plaintiff on behalf of Iovance has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

296.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

297.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Iovance, for which they are legally responsible.

298.     As a direct and proximate result of the Individual Defendants' abuse of control, Iovance has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Iovance has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

299.     Plaintiff on behalf of Iovance has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

300.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

301.     By their actions alleged herein, the Individual Defendants, either directly or through

aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Iovance in a manner consistent with the operations of a publicly-held corporation.

302.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Iovance has sustained and will continue to sustain significant damages.

303.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

304.    Plaintiff, on behalf of Iovance, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

305.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

306.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, defendants have caused Iovance to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

307.    The Company also wasted corporate assets in furtherance of the Stock Promotion Scheme by indirectly paying Lidingo to disseminate promotions touting the Company and by paying the fine to the SEC.

308.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

309.    Plaintiff on behalf of Iovance has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendant Bjorlin for Aiding and Abetting Breach of Fiduciary Duty**

310.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

311.    Defendant Bjorlin aided and abetted the Individual Defendants who breached their fiduciary duty to Iovance.

312.    Defendant Bjorlin's misconduct resulted in continuous, connected, and on-going harm to the Company.

313.    Specifically, Defendant Bjorlin controlled and operated Lidingo, a company that was instrumental to carrying out the Stock Promotion Scheme, and was aware that such a scheme was in violation of the law due to previous government and private actions filed against Lidingo. Defendant Bjorlin nonetheless aided and abetted the Stock Promotion Scheme to reap personal financial benefit.

314.    Defendant Bjorlin is jointly and severally liable the same extent as any other Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

315.    As a direct and proximate result of Defendant Bjorlin's aiding and abetting of Iovance's directors' and officers' breaches of duty alleged herein, Iovance has sustained and will continue to sustain substantial damages.

316.    Plaintiff on behalf of Iovance has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Iovance, and

that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 of the Exchange Act;

(c)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Iovance;

(d)     Determining and awarding to Iovance the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(e)     Directing Iovance and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Iovance and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Iovance to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(f)    Awarding Iovance restitution from Individual Defendants, and each of them;

(g)    Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

      (h)   Granting such other and further relief as the Court may deem just and proper.


Dated: December 15, 2017            Respectfully submitted,

                                 **FARNAN LLP**

                                 /s/ Brian E. Farnan
                                 Brian E. Farnan (Bar No. 4089)
                                 Michael J. Farnan (Bar No. 5165)
                                 919 N. Market St., 12th Floor
                                 Wilmington, DE 19801
                                 Telephone: (302) 777-0300
                                 Facsimile: (302) 777-0301
                                 Email: bfarnan@farnanlaw.com
                                            mfarnan@farnanlaw.com

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

                                 *Attorneys for Plaintiff*